**RAYMOND CONSTRUCTORS OF AFRICA, LTD.**

v.

The **UNITED STATES.**

No. 175–65.

United States Court of Claims.

June 20, 1969.

Thomas S. Jackson, Washington, D. C., for plaintiff; Austin P. Frum, Washington, D. C., attorney of record. Jackson, Gray & Laskey, Washington, D. C., of counsel.

Steven L. Cohen, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant. R. W. Koskinen, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM: *

The plaintiff presented in the petition six claims growing out of the construction by the plaintiff of a demonstration road in the Sudan.

Three of the six claims that were originally set out in the petition have been abandoned by the plaintiff. Therefore, only three claims remain in the case for disposition by the court.

It is our opinion that the plaintiff is entitled to recover on one of the remaining claims, but not on the other two.

### Introduction

The plaintiff is a corporation organized and existing under the laws of Liberia. It is a wholly owned subsidiary of Raymond International, Inc., a corporation organized and existing under the laws of New Jersey. During the period that is involved in the present case, both the plaintiff and its parent corporation maintained their home offices in New York City.

During the period 1959–1962, the defendant's International Cooperation Administration (now the Agency for International Development), in furtherance of the defendant's foreign aid program, maintained in The Republic of the Sudan a mission that was known as the United States Operations Mission and was frequently referred to as "the USOM." This mission, which operated under the general supervision of the defendant's embassy at Khartoum, the capital of the Sudan, was headed by a director, who was stationed in Khartoum. The USOM handled the technical, financial, and other assistance that was provided by the defendant to the Sudanese government.

Sometime prior to April 1959, the United States Operations Mission proposed to officials of The Republic of the Sudan that a demonstration road project be constructed in the Sudan, with financial assistance from the defendant. At that time, there were no modern highways in the Sudan. It was proposed by the USOM to the Sudanese government that the demonstration road be constructed as a modern blacktop highway in the vicinity of Khartoum, for the purpose of demonstrating what was involved in the construction of a modern highway, what it would cost, and the benefits that would be derived from it. It was also believed by personnel of the USOM that the construction of a segment of a modern road as a demonstration highway would educate the Sudanese in contracting for, administering, and financing a road project, and also in the engineering aspects of road-building to some extent.

The government of The Republic of the Sudan approved the proposal relative to the construction of a demonstration road project. With the concurrence of the United States Operations Mission, the Sudanese government decided that the demonstration road would start at Khartoum North and go approximately 21 kilometers in a northerly direction to Khogalab. The latter is situated in a rather large agricultural area near the Nile River, downstream from the confluence of the Blue Nile and the White Nile.

On or about June 25, 1959, the defendant and the government of The Republic of the Sudan entered into an agreement (usually referred to as "the project agreement") relative to the construction of a demonstration road approximately 21 kilometers in length from Khartoum North to Khogalab. The project agreement was subsequently revised several times. In its final form, the project agreement not only covered the construc-

---

* This opinion incorporates, with some changes in the portion headed "Equipment", the opinion of Trial Commissioner Mastin G. White.

tion of the demonstration road from Khartoum North to Khogalab, but it also provided for the extension of the road to Kabbashi Village, approximately 8½ kilometers beyond Khogalab. Total financing equivalent to $1,460,000 was provided for, of which total the Sudanese government was to furnish the equivalent of $900,000 in Sudanese pounds (LS 313,-200). The remainder of the financing, $560,000, was to be provided by the defendant in United States dollars, $310,000 being made available for "contract services" and $250,000 being made available for "commodities." The "commodities" were to consist of major items of construction equipment that would be procured by the defendant and delivered at Port Sudan to the Sudanese government, which, in turn, was to make such construction equipment available for use in the construction of the demonstration road by the contractor selected for the job. The ownership of the equipment was to be vested in and retained by the Sudanese government.

The Sudanese Ministry of Works issued an invitation for competitive tenders or bids with respect to the construction of the demonstration road, the plaintiff and other construction companies submitted such tenders, and the plaintiff was selected as the successful low bidder. The plaintiff's tender was accepted on or about October 27, 1959; and a formal contract was entered into between the plaintiff and the government of The Republic of the Sudan on or about November 11, 1959. The contract provided for the performance by the plaintiff of the various items of work involved in the construction of the demonstration road, stating as to each item the estimated quantity, the unit price, and the estimated total price for the item. The original contract gave the estimated contract price for all items as the equivalent of $750,455, and provided that the maximum amount to be paid in United States dollars was $175,000, with the remainder of the estimated contract price to be paid in Sudanese pounds.

After the project agreement between the defendant and the Sudanese government was revised, as previously indicated, for the purpose of extending the demonstration road for an additional distance of approximately 8½ kilometers beyond Khogalab to Kabbashi Village, the plaintiff and the Sudanese government entered into a supplemental contract providing for the 8½ kilometer extension of the demonstration road. This supplemental contract enlarged the estimated quantities previously set out in the contract; and it increased the estimated contract price to the equivalent of $1,158,-091.57, increased the maximum amount to be paid in United States dollars to $310,-000, and increased the amount that was to be paid in Sudanese pounds. The unit prices stated in the original contract were not changed by the supplemental contract.

The plaintiff made a subcontract with the Sudanese Construction Company for the performance by the latter of the earthwork items under the prime contract between the plaintiff and the Sudanese government.

At about the time when the plaintiff entered into the contract with the Sudanese government for the construction of the demonstration road, the plaintiff also entered into a letter of understanding with the International Cooperation Administration. This document referred to a request from the Sudanese government that the ICA finance the dollar payments under the contract for the construction of the demonstration road, and further stated in part as follows:

ICA requires, as conditions or prerequisites to its financing, agreement by you [i. e., the plaintiff] to certain conditions as follows:

1. *Conformity*—You will fully and completely perform said Contract in accordance with its terms and comply in all respects with the terms and conditions of this Letter of Understanding.

2. *Maximum Dollar Obligation*—It is understood that ICA's maximum

obligation in financing the Contract shall not exceed 175,000 U. S. dollars, unless ICA shall, by written notice to you at the above address, agree to increase its maximum obligation hereunder.

\*    \*    \*    \*    \*    \*

5. *Non-Dollar Costs*—It is understood that no non dollar costs under the Contract will be financed by ICA.

Subsequently, after arrangements were made for the extension of the demonstration road for approximately 8½ kilometers beyond Khogalab to Kabbashi Village, paragraph numbered 2 of the letter of understanding between the plaintiff and the International Cooperation Administration was amended "to increase ICA's maximum obligation in financing the Contract \* \* \* from $175,000 to $310,000."

### Aggregate Base

One of the claims asserted by the plaintiff in the present action is based upon the allegation that the cost of constructing the demonstration road in the Sudan was increased because personnel of the defendant violated an "agreement with the plaintiff that only unsieved and mechanically loaded 'pit run' aggregate material need be used" in constructing the base of the demonstration road.

Pit-run aggregate is aggregate just as it is dug out of a pit or borrow area. It is excavated mechanically, and it is loaded on a vehicle and delivered to the job site for use in the construction process, without being screened or sieved by hand labor.

The evidence in the record shows that personnel of the defendant's Bureau of Public Roads was assigned to, and formed part of, the United States Operations Mission in the Sudan. The top person in this category was Herman Gaines. He was the principal official of the USOM with respect to highway matters, although he served under the administrative supervision of the Director of the USOM.

The evidence also shows that the specifications for the proposed demonstration road, and the other contract documents which the Sudanese Ministry of Works furnished to the plaintiff and other prospective bidders as part of the invitation for tenders, were prepared in the office of Herman Gaines and by personnel of the defendant, in conjunction with the Sudanese Ministry of Works. The specifications and other contract documents were modeled principally on documentary material customarily used by the defendant's Bureau of Public Roads.

One of the items of work referred to in the invitation for tenders was designated as "Aggregate Base," with an estimated quantity of 75,000 cubic meters.

In August 1959, B. B. Talley, a retired brigadier general of the U. S. Army, who at that time was president of the plaintiff and vice president of the plaintiff's parent corporation, visited the Sudan during the course of a business trip abroad. General Talley had previously heard of the proposal for the construction of a demonstration road in the Sudan. On the occasion of the August 1959 visit to the Sudan, General Talley was permitted to examine the plans for the proposed demonstration road; he went over part of the prospective route in a jeep with one of Herman Gaines' assistants; and he discussed with personnel of the defendant the subject of the materials that were to be used in the construction of the demonstration road. General Talley was shown certain borrow areas that had been designated by Sudanese officials, acting on the advice of personnel of the defendant's Bureau of Public Roads, as sources of aggregate to be used in constructing the base of the demonstration road. He looked at some of the material in such designated areas, but he did not make any engineering tests. General Talley noted that the aggregate material in the designated borrow areas which he examined was primarily a desert sand, and was quite fine. This caused General Talley some

concern, because it was his opinion that the material contained an excess of "fines" and was deficient in coarse material.

General Talley was aware that a road base made of aggregate containing an excess of fines would provide shoulders to the road that would not stand up under usage. He was also aware that the borrow areas which he examined would not provide a sufficient amount of aggregate for the base of the entire demonstration road.

On or about September 21, 1959, the plaintiff received an invitation for tenders or bids on the proposed contract for the construction of the demonstration road in the Sudan. The invitation stated that the deadline for the submission of tenders was noon on October 27, 1959. They were to be submitted to the Sudanese Ministry of Works in Khartoum.

After receiving the invitation for tenders referred to in the preceding paragraph, the plaintiff began the preparation of its estimate of the costs that would be involved in the construction of the demonstration road, and the preparation of a tender to be submitted on the proposed contract. This work was completed by October 20, 1959. General Talley went to Khartoum a few days later for the purpose of submitting the plaintiff's tender. He arrived in Khartoum on Sunday, October 25, 1959.

After arriving in Khartoum, General Talley called Herman Gaines on the telephone and made an appointment to see him the next day, October 26, 1959. On the morning of October 26, General Talley went to see Herman Gaines; and they discussed the specifications for the demonstration road project. General Talley asked Mr. Gaines for a clarification of, *inter alia,* the specifications with respect to aggregate and overhaul.

As previously indicated, General Talley in August 1959 had looked at some of the borrow areas that were designated as sources of aggregate to be used in constructing the base of the demonstration road; and he had noted that the material in those borrow areas seemed to contain an excess of fines and to be deficient in coarse material. In connection with the submission of the plaintiff's tender, General Talley wanted to find out whether it would be necessary to utilize hand labor for the purpose of screening or sieving such material in order to eliminate the excess of fines, or whether it was intended under the proposed contract that pit-run aggregate would be used. In response to an inquiry, Herman Gaines informed General Talley at the conference on October 26, 1959, that it was intended under the proposed contract that pit-run aggregate would be used in the construction of the road base, without screening or sieving it.

As General Talley was aware that the borrow areas for aggregate which he had examined in August 1959 did not contain enough aggregate for the construction of the entire road base, and that it would be necessary to obtain part of the aggregate from somewhere else, he wanted to find out whether the contractor would be paid for any overhaul of aggregate (i. e., haulage for any distance greater than 1,000 feet). General Talley mentioned this subject to Herman Gaines at the conference on October 26, 1959; and Mr. Gaines informed General Talley that the contractor would be paid for any overhaul of aggregate for the road base.

As a result of General Talley's conference with Herman Gaines on October 26, 1959, General Talley modified the bid that had been prepared on behalf of the plaintiff relative to the aggregate base item. On the basis of the understanding that pit-run aggregate would be used for the road base, thus eliminating the factor of hand labor for screening or sieving the aggregate, and that the contractor would be paid for any overhaul of aggregate, General Talley reduced the plaintiff's bid on the aggregate base item from a unit price of $3.78 per cubic meter, as theretofore tentatively fixed by the plaintiff, to a unit price of 37 cents per cubic meter. Furthermore, in order that the bid might conform to his under-

standing that no screening or sieving of the aggregate to be used in the construction of the road base would be required, General Talley placed a handwritten asterisk next to the item relative to the aggregate base on the bid, with the asterisk referring to a handwritten note added by General Talley on the back of the same sheet and stating as follows: "Unseived [sic] machine loaded aggregate placed and compacted on prepared roadbed in accordance with Article 200–1.1."

The article cited by General Talley in the handwritten note which he added to the plaintiff's bid was contained in FP–57, the Standard Specifications for Federal Road Projects, promulgated by the defendant's Bureau of Public Roads. The contract papers accompanying the invitation for tenders indicated that this article was to be incorporated by reference in the contract for the construction of the demonstration road.

When the plaintiff's tender was subsequently accepted and the plaintiff entered into the contract with the Sudanese government for the construction of the demonstration road, the note which General Talley had added to the plaintiff's bid on the aggregate base item became a part of the contract.

The personnel of the defendant's Bureau of Public Roads in the Sudan, forming part of the United States Operations Mission, was organized to work with the Sudanese officials in connection with the construction of the demonstration road, and to advise them and instruct them regarding methods of operation. The objective was for the Sudanese officials to handle the administration of the project, and for the personnel of the Bureau of Public Roads to act in the role of consultants. Thus, it was customary for all written directives to the plaintiff (or its subcontractor) to be issued by the Sudanese resident engineer, but with respect to all matters of consequence, he acted after consultation with, and on the advice of, personnel of the Bureau of Public Roads. Also, in the actual administration of the project, some directives to the plaintiff (or its subcontractor) regarding important matters were issued orally in the first instance by personnel of the Bureau of Public Roads, and were then confirmed in writing by the Sudanese resident engineer.

The Sudanese Construction Company, which was the plaintiff's subcontractor for the performance of the earthwork items under the prime contract, began laying the aggregate base sometime between October 1 and October 15, 1960.

The aggregate for the road base was excavated mechanically from designated areas; it was loaded on vehicles and delivered to the job site; and it was dumped on the roadway for incorporation in the road base, without being screened or sieved. However, in those instances where the aggregate from a particular borrow area would not, if used alone, make a suitable road base because of an excess of fines, the plaintiff (or its subcontractor) was required, after such aggregate was dumped on the roadway, to add to it and blend in with it coarser material from another source, so that the blended aggregate would provide a suitable road base in accordance with FP–57. The addition and blending of the coarser material were accomplished by the use of machinery.

Instructions for the addition and blending of aggregate as indicated in the preceding paragraph, were issued to the plaintiff (or its subcontractor) by the Sudanese resident engineer. However, the latter official acted upon the advice of personnel of the defendant's Bureau of Public Roads.

The plaintiff's project manager complained about the requirement with respect to the addition and blending of aggregate; and on November 15, 1960, he notified the Sudanese resident engineer that "Under the circumstances we must advise that we shall place a claim for the extra costs incurred in performing this item in the manner instructed by you * * *."

The primary question in connection with the plaintiff's claim relative to the aggregate base is whether the requirement concerning the addition and blending of aggregate, as previously described, was inconsistent with and violated General Talley's note, as incorporated in the contract, to the effect that the aggregate base was to consist of "Unseived [sic] machine loaded aggregate placed and compacted on prepared roadbed in accordance with Article 200–1.1" of FP–57. It is our conclusion that this primary question should be answered in the negative.

The evidence indicates clearly that the note quoted in the preceding paragraph was added by General Talley to the plaintiff's bid on the aggregate base item in order to make sure that the plaintiff would not be required to utilize hand labor for the purpose of screening or sieving aggregate for the road base, but, instead, that the plaintiff would be permitted to use for the road bed base aggregate just at it was after being mechanically excavated from designated borrow areas. In the actual construction process, the plaintiff (or its subcontractor) was permitted to do just what General Talley sought to ensure, i. e., to excavate the aggregate mechanically from designated borrow areas, load it on vehicles, deliver it to the job site, and dump it on the roadway for incorporation in the road base, without being screened or sieved.

The possibility of having to blend mechanically aggregate from different sources in order to achieve a suitable road base meeting the requirements of FP–57 was not raised by General Talley during his conference with Herman Gaines on October 26, 1959; and such a possibility was not negatived, either expressly or impliedly, by the handwritten note which General Talley added to the plaintiff's bid on the aggregate base item. That note merely specified that the aggregate base was to consist of "Unseived [sic] machine loaded" material, and such material was actually used.

Furthermore, the blending of aggregate in the road base was seemingly contemplated by a special provision in the contract between the plaintiff and the Sudanese government, which stated in part as follows:

\* \* \* It is intended that the completed base shall conform to one of the grading schedules in table 200–1 but minor deviations will be permitted if quality is otherwise satisfactory. *It is intended that desired gradations will be produced by selection and blending.* [Emphasis supplied.]

Thus, it is not surprising that when the plaintiff's project manager wrote to the plaintiff's home office in New York City concerning the requirement that aggregate from different sources be blended in order to achieve a satisfactory road base, the reply from the plaintiff's home office stated in part as follows:

\* \* \* In checking our files the only qualification to our bid reads as follows: "Aggregate base is understood to be unseived [sic], machine loaded aggregate, placed and compacted on prepared roadbed in accordance with Article 200–1.1". There is an amendment to Section 10b in Aggregate Base Specification which definitely calls for the material to be blended by the contractor at his own expense. If it is possible to open negotiations for further payment on this item, you are authorized to negotiate.

■ It must be concluded, therefore, that the evidence in the record does not sustain the allegation in the petition to the effect that personnel of the defendant violated an "agreement with the plaintiff that only unsieved and mechanically loaded 'pit run' aggregate material need be used" in constructing the base of the demonstration road.

The conclusion stated in the preceding paragraph makes it unnecessary to consider any of the subsidiary questions that would otherwise be involved in the plaintiff's claim relative to the aggregate base.

## Borrow Course

Another claim presented by the plaintiff in the present litigation is based upon the allegation that personnel of the defendant required the plaintiff "To blend, disc, harrow and rework the borrow materials, notwithstanding that defendant had designated certain 'borrow pits' and agreed that the material from the said borrow pits would be acceptable for use on the said road."

The plaintiff did not point out clearly in the petition, or through its witnesses at the trial, just how the quoted requirement with respect to the borrow material violated any agreement between the plaintiff and the defendant or the plaintiff's contract with the Sudanese government.

The original contract between the plaintiff and the Sudanese government called for the placement by the plaintiff of an estimated quantity of 330,000 cubic meters of "Borrow Excavation (Case 1)" at a unit price of 33 cents per cubic meter. The estimated quantity was later increased when arrangements were made to extend the demonstration road for an additional distance of 8½ kilometers. The work of placing the borrow course was to be done in accordance with FP–57, the Standard Specifications for Federal Road Projects, promulgated by the defendant's Bureau of Public Roads.

The borrow course of a roadway is the subbase for the aggregate base. It is usually constructed of whatever type of local earth that is available, such as sand or clay, but it should have a sufficiently low plasticity index to provide a stable subbase when the completed road is subjected to the passage of heavy vehicles or wet weather, and it should be of such a consistency as to be capable of compaction prior to the placement of the aggregate base upon it.

The borrow course for the initial 21-kilometer section of the demonstration road was laid by the plaintiff's subcontractor, the Sudanese Construction Company. The subcontractor began this work sometime before February 29, 1960, and completed the borrow course for the initial 21-kilometer section of the road in February 1961. The borrow course for the 8½-kilometer extension of the demonstration road was laid by the plaintiff in conjunction with the subcontractor.

The material for the borrow course was taken from borrow pits designated by the Sudanese resident engineer, acting on the advice of personnel of the defendant's Bureau of Public Roads. Some of the borrow thus obtained was a very plastic clay material from alluvial deposits along the Nile River; and as such material was dumped on the roadway for use on the borrow course, the plaintiff (or its subcontractor) was required by the Sudanese resident engineer—acting upon the advice of personnel of the defendant's Bureau of Public Roads—to add some sand to the clay for the purpose of lowering the plasticity index, to blend the sand and clay together mechanically, and then to water and compact the blended material. On the other hand, some of the designated borrow areas consisted of sand; and in those situations, after the sand was dumped on the roadway for use in the borrow course, the plaintiff (or its subcontractor) was required to add some clay to the sand in order to make it more compactable, to blend the sand and clay together mechanically, and then to water and compact the blended materials.

■ The evidence in the record does not prove that the Sudanese resident engineer, or the personnel of the defendant's Bureau of Public Roads, went beyond the requirements of the contract between the plaintiff and the Sudanese government, or violated any agreement between the plaintiff and the defendant, in requiring the plaintiff (or its subcontractor) to blend mechanically borrow materials from different sources in order to achieve a borrow course which was capable of being compacted and would provide a stable subbase for the aggregate base, and thus meet the requirements of FP–57.

It necessarily follows that the plaintiff is not entitled to recover on its claim relative to the borrow course.

## Equipment

As previously indicated in the introductory portion of this opinion, the project agreement, as revised, between the defendant and the Sudanese government provided that the defendant would procure the major items of construction equipment which would be needed in the construction of the demonstration road and would deliver them to the Sudanese government at Port Sudan; that the ownership of such equipment was to be vested in and retained by the Sudanese government; and that the Sudanese government would make the construction equipment available to the contractor selected for the job.

Also, the contract that was subsequently entered into between the Sudanese government and the plaintiff for the construction of the demonstration road included an "equipment and rental list" describing 42 pieces of equipment that were to be furnished by the Sudanese government to the plaintiff for use in the performance of the work under the contract, and specifying the hourly rental rates in Sudanese pounds that were to be paid by the plaintiff for the several pieces of equipment. The equipment was to be operated and maintained at the expense of the plaintiff.

It should also be mentioned in this connection that the subcontract between the plaintiff and the Sudanese Construction Company, covering the performance by the latter of the earthwork items under the prime contract, contemplated that the earth-moving equipment which the Sudanese government was to furnish the plaintiff would, in turn, be furnished by the plaintiff to the subcontractor, and that such equipment would be operated and maintained at the expense of the subcontractor.

These several documents included, of course, an implied requirement that the equipment should be made available when it was reasonably needed for the construction of the demonstration road. However, this requirement was not fulfilled.

The evidence in the record indicates that there was a great deal of delay in the delivery of government-furnished earth-moving equipment to the job site for use by the subcontractor in the construction of the demonstration road. The first piece of such equipment was made available on December 29, 1959; other pieces of equipment were made available in January, February, May, and June of 1960; and the last piece of such equipment was not made available until October 20, 1960, which was about a year after the commencement of the work.

While awaiting the delayed delivery of the earth-moving equipment provided for under the project agreement, the prime contract, and the subcontract, the subcontractor improvised by renting other equipment, either from the Sudanese Ministry of Works or from other sources in the Sudan. Equipment was rented by the Ministry of Works to the subcontractor on a day-to-day basis, so that it could be taken back by the Ministry when needed on other work or could be returned by the subcontractor when not needed on the project. Some of the equipment thus obtained by the subcontractor was old, and was more expensive to operate and maintain than new equipment would have been.

The evidence in the record clearly warrants a general finding to the effect that the subcontractor incurred additional expenses because of the delay in receiving government - furnished earth - moving equipment. However, no actual cost figures from the subcontractor's books and records were presented at the trial, and there is no way of determining with reasonable accuracy the amount of the subcontractor's additional expenses attributable to the delay in receiving government-furnished equipment.

Furthermore, no evidence was presented to establish that the plaintiff has made any extra payment to the subcontractor, or is obligated to make any extra payment to the subcontractor, because of the additional expenses incurred by the subcontractor due to the late

delivery of government-furnished equipment. The lack of such evidence is doubtless due to the circumstance that the subcontract contained an exculpatory provision expressly stating that:

> Subcontractor shall not be entitled to, and hereby waives, any and all damages which it may suffer by reason of Raymond or Owner [Sudanese government] hindering or delaying Subcontractor in the performance of the work, or any portion thereof, from any cause whatsoever.

■ In order for any recovery to be allowed in the present action on account of the extra expenses incurred by the subcontractor due to the delay in the delivery of government-furnished equipment, it would be necessary for the evidence to be consistent with a valid claim by the subcontractor against the plaintiff under the subcontract. In the absence of that link, there is no basis upon which to impose on the defendant in the present action responsibility for the extra expenses incurred by the subcontractor due to the late delivery of government-furnished equipment.

The evidence in the record shows that the plaintiff was delayed a total of 142 days in completing the work under the contract for the construction of the demonstration road, and that the plaintiff's own expenses, in the form of indirect costs, were increased to the extent of $22,319.57 as a result of such delay. The plaintiff originally attributed the entire 142 days, and all of its extra expenses, to the defendant's delay in delivering equipment that was needed for the performance of the work under the contract.

However, the evidence shows that although the delay in the delivery of government-furnished equipment to the job site was partially due to delay on the part of the defendant in procuring such equipment and delivering it to the Sudanese government at Port Sudan, there was also delay on the part of the Sudanese government in transporting the equipment from Port Sudan to the job site.

Furthermore, the evidence shows that the overall delay in completing the work under the contract was not only attributable to the late delivery of government-furnished equipment to the job site, but was also partially due to the subcontractor's inexperience, inefficiency, and failure to use available equipment to maximum advantage.

Actually, there is no basis in the record on which a precise allocation of responsibility for the overall delay in completing the work under the contract can be made as between the defendant's delay in procuring equipment and delivering it to the Sudanese government at Port Sudan, the Sudanese government's delay in transporting equipment from Port Sudan to the job site, and the subcontractor's shortcomings. In such a situation, it seems that the only feasible thing to do is to make a finding in the nature of a jury verdict that the defendant's delay in procuring equipment and delivering it to the Sudanese government at Port Sudan was responsible for one-third of the overall delay in the completion of the work under the contract and, hence, for one-third of the extra indirect expenses that were incurred by the plaintiff because of such overall delay, or $7,440.

■ In this connection, the defendant says that its commitment with respect to the furnishing of equipment was made to the Sudanese government in the project agreement, as revised, and that the plaintiff was not a party to such agreement. However, there was, in addition, a direct contractual tie between defendant and plaintiff. The letter of understanding with the International Cooperation Administration (referred to at the beginning of this opinion) constituted a contract directly between the two parties now before us. The Government argues that, so far as the United States was concerned, that agreement was strictly limited to a promise by the defendant to pay a portion of the contract price in dollars. But taken in context and with

the surrounding circumstances, we think that there was also implied in the letter of understanding an undertaking (directly to the plaintiff) on the part of the Federal Government to perform those things, bearing on plaintiff's work, which the defendant had told the Sudanese government and the plaintiff that it would do. Not only did the International Cooperation Administration solicit the plaintiff's interest in the work (finding 11), but the formal invitation for bids characterized "the proposed project" as "a joint effort by the Ministry of Works, an agency of the Government of the Republic of the Sudan, and the International Cooperation Administration (ICA), an agency of the Government of the United States of America". Defendant's employees and representatives were intimately connected with the entire course of the project and often dealt directly with plaintiff's representatives. The letter of understanding provided that the United States would pay its share directly to the plaintiff, and the plaintiff's contract with the Sudanese government provided for an appeal of disputes "which will directly affect the amount of U. S. dollar payments under the contract" to the Director, ICA. In these circumstances, the case is very different from D. R. Smalley & Sons, Inc. v. United States, 372 F.2d 505, 508, 178 Ct.Cl. 593, 598, cert. denied, 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967), in which the "defendant did not sign the contracts with the plaintiff and there were no negotiations or communications whatsoever between them". Here, in contrast, there was a written agreement directly between plaintiff and defendant, and in context that written agreement should be read as impliedly binding the Government to the plaintiff to perform what the Government had squarely told plaintiff (as well as the Sudanese government) that it would perform.

The defendant then argues that, in any case, the plaintiff's recovery is subject to the limitation in the contract between the plaintiff and the Sudanese government that "the total of U. S. dollar payments to the Contractor *in no event* shall exceed $310,000.00" (emphasis supplied), and to the limitations in the letter of understanding that "It is understood that ICA's maximum obligation in financing the Contract shall not exceed $310,000 U. S. dollars, unless ICA shall, by written notice to you * * *, agree to increase its maximum obligation hereunder", and that "It is understood that no non-dollar costs under the Contract will be financed by ICA." [1] We have held, however, that maximum limitations of this type "do not ordinarily control where the contractors suffer additional costs because of the Government's fault". Scherr & McDermott, Inc. v. United States, 360 F. 2d 966, 971, 175 Ct.Cl. 440, 450 (1966) (also involving a direct contract with ICA). To the same effect are Anthony P. Miller, Inc. v. United States, 348 F.2d 475, 172 Ct.Cl. 60 (1965), and Ross Construction Corp. v. United States, 392 F. 2d 984, 183 Ct.Cl. 694 (1968). The inclusion, in this instance, of the words "in no event" in the project agreement (but not, it may be noted, in the letter of understanding) does not persuade us that the maximum limitation was intended to apply even though the overrun was directly due to the Government's failure to perform.[2] As in our prior decisions on this point, we refuse to attribute to the contracting parties "an intention that would produce an impractical, unjust, and unworkable result unless the intention appears clearly on the face of the [contract] or in the supporting record." Anthony P. Miller, Inc. v. United States, *supra,* 348 F.2d at 480, 172 Ct.Cl. at 68; Ross Construction Corp. v. United States, *supra,* 392 F.2d at 986, 183 Ct.Cl. at 698.

---

1. There is no evidence that ICA ever agreed in writing (or otherwise) to increase its maximum obligation beyond $310,000.

2. The contract limitation in *Scherr & Mc-Dermott, supra,* also contained the phrase "in no event", 360 F.2d at 967, 175 Ct.Cl. at 443.

Accordingly, plaintiff is entitled to recover the entire sum of $7,440, which we have found is the amount of damage attributable to the defendant.[3] Judgment will be entered for that sum.

3. Before the trial commissioner, but not before the judges, defendant argued that the plaintiff's claim is barred by 28 U.S.C. § 1502 (1964), providing that this court "shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations". We need not, and do not, consider this defense, both because defendant has failed to preserve it before the judges and because we place our holding, not on the project agreement between the United States and the Sudanese government, but on the letter of understanding directly between plaintiff and defendant. In that respect (as in others) this case is like Scherr & McDermott, Inc. v. United States, *supra*.