**KOREA DEVELOPMENT CORPORATION**

v.

**The UNITED STATES.**

**No. 121–84C.**

United States Claims Court.

Nov. 18, 1985.

John B. Tacke, Washington, D.C., Atty. of Record, for plaintiff.

Michael T. Paul, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Steve Narkin and

Kathy A. Buller, Agency for Intern. Development, Washington, D.C., of counsel.

## OPINION

YOCK, Judge.

Plaintiff brings this contract action before the Court based on the Tucker Act, 28 U.S.C. § 1491 (1982). The plaintiff alleges in its complaint that the Government breached its contractual obligation to pay for extra costs incurred in obtaining a 100 percent performance bond acceptable to the defendant and in extra costs incurred when various construction items were deleted from the contract. Plaintiff's prayer for recovery is based on theories of express and implied-in-fact contract law.

The defendant has now moved for summary judgment. For the reasons set out herein, the defendant's motion for summary judgment is granted and the case is to be dismissed. R.U.S.C.C. 12(b). The material facts are not in dispute.

### Facts

On July 28, 1978, the United States Agency for International Development (AID), an agency of the United States Government, executed a grant agreement with the Republic of Bangladesh. In essence, AID agreed in that grant to provide the Republic of Bangladesh with up to 150 million dollars of foreign aid assistance for the purpose of assisting that third world nation's efforts to grow sufficient agricultural crops to feed its people. This grant focused primarily on improving Bangladesh's fertilizer distribution and marketing systems. Under the terms of that agreement, AID reserved the right to approve certain documents generated in connection with the construction projects which it financed. Contracts, plans, specifications, schedules, and financial guarantees and bonds were included in the types of documents that were subject to AID approval.

In carrying out its part of this agreement, the Republic of Bangladesh through its agency, the Bangladesh Agricultural Development Corporation (BADC), issued an invitation for bids in late 1980 for the construction of a "bagged product fertilizer warehouses project" in the Republic of Bangladesh. On March 24, 1981, the plaintiff in this action, Korea Development Corporation (KDC), submitted a bid in the amount of $53,000,000 to BADC. In paragraph 3 of its bid, KDC stated:

> If our bid is accepted we will, if required, obtain the guaranty of an Insurance Company or Bank or other sureties (to be approved by you) to be jointly and severally bound with us in the sum not exceeding 100 percent of the above-named sum for the due performance of the Contract under the terms of the Bond to be approved by you.

A bid opening was held on March 25, 1981, and the International Engineering Company, Inc. (IECO), acting in the capacity of BADC's agent, determined that KDC had submitted the responsive and low bid. Accordingly, on April 20, 1981, IECO recommended to BADC and to AID that the contract be awarded to KDC.

The approval by AID was required before the contract could be awarded. In exercising this authority, AID was acting pursuant to the grant agreement that it had executed with the Republic of Bangladesh. After a complete evaluation of the contract, bid documents, financial capabilities of the respective bidders, and taking into account the recommendations of the project engineer/manager (IECO), AID approved the award of the contract to KDC on June 16, 1981.

Thereafter, by letter dated June 20, 1981, BADC notified KDC that it accepted KDC's bid. The letter also stated in pertinent part:

> You are, therefore, requested to furnish the 100% performance bond as required in the tender document for due performance of the contract within ten (10) days as provided in the Bid Bond form which is incorporated by reference in your Bid Bond.
>
> You will please note that the submission of the bond is a condition precedent

to execution of the formal contract agreement. As such your prompt action in this matter will highly be appreciated.

In response to BADC's letter of intent to award the contract, KDC, on June 24, 1981, requested that it be allowed to furnish a bank guarantee of 10 percent of the contract amount in lieu of the 100 percent performance bond called for by the bid documents, and that its tender requirement to furnish the bond in 10 days be extended until such a decision could be made. There followed several meetings and many letters back and forth on the bond matter between the various parties to the agreements. Although AID initially was willing to consider KDC's request, BADC throughout the discussions was adamant that a 100 percent performance bond was called for by the contract documents, and was appropriate under the circumstances. Asserting in a letter to KDC dated July 14, 1981, that it was "the only party that has a contractual relationship with KDC," BADC insisted that the 100 percent performance bond "is an explicit condition" of the bid documents, and that KDC therefore provide "a 100% performance bond in the form of either a surety bond or an irrevocable letter of credit." KDC eventually complied with this requirement. By letter dated October 15, 1981, KDC stated to BADC in pertinent part:

We now take pleasure in enclosing the required Bank Guarantee No. 455/81&PB/USD/029 dated 15th Oct. 1981 for US$50,000,000/–(U.S. DOLLAR FIFTY MILLION) jointly issued by American Express International Banking Corporation & Indosuez-French International Bank, Dacca in favour of you.[1]

On October 16, 1981, BADC and KDC entered into a contract for construction of the fertilizer warehouse project. The instrument itself set forth the legal relationships among the various entities involved. For example, the document made it clear

that BADC and KDC were the parties to the contract. Clause 73 of the contract specifically stated:

*Legal Effect of AID Approvals and Decisions*

The parties hereto understand that the contract has reserved to AID certain rights such as, but not limited to, the right to approve the terms of this contract, the Contractor, and any or all plans, reports, specifications, subcontracts, bid documents, drawings, or other documents related to this contract and the project of which it is part. *The parties hereto further understand and agree that AID in reserving any or all of the foregoing approval rights, has acted solely as a financing entity to assure the proper use of United States Government funds, and that any decision by AID to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing this project and shall not be construed as making AID a party to the contract.* The parties hereto understand and agree that AID may, from time to time, exercise the foregoing approval rights, or discuss matters related to these rights and the project with the parties jointly or separately, without thereby incurring any responsibilities or liability to the parties jointly or to any of them. Any approval (or failure to disapprove) by AID shall not bar the Employer or AID from asserting any right, or relieve the Contractor of any liability which the Contractor might otherwise have to the Employer or AID. [Emphasis added.]

In addition, IECO was designated to act as BADC's project manager/engineer/agent. Clause 2, Part II of the contract provided in pertinent part:

(3) The Engineer will act as agent for, and representative of, BADC in all mat-

---

1. There appears to be a dispute of fact as to whether the bank guarantee was issued jointly by the American Express International Banking Corporation and the Indosuez-French International Bank, or whether these two banks merely endorsed the guarantee of the Hanil Bank of Seoul, Korea. In any event, both parties are in agreement that it is not a material dispute of fact for the purposes of resolving the instant summary judgment motion.

ters germane to this contract during the contract period as stipulated in IECO's contract with BADC dated 18 September, 1979.[2]  This includes but is not limited to, monitoring, inspecting and approving construction work.

\*　　\*　　\*　　\*　　\*　　\*

(6) Acceptance of Work and Payment. The Engineer will have authority on behalf of BADC for accepting work completed for the purpose of progress payment and final payments to the Contractor.  In this regard, the Engineer will certify work completed; provide certification for payments to the Contractor; and will closely watch the progress of the Contractor for the purpose of authorizing payments for work completed.

(7) In measuring, valuing or certifying, the Engineer is not intended to act as arbitrator but as an Engineer acts by his skill and from his knowledge of the facts. The Engineer shall at all times be considered to be aware of all facts necessary for him to form his own opinions, make his measurements or valuations, given his decisions and orders, make his requisitions, or give or refuse his certificate.

Contemporaneously with the execution of its contract with BADC on October 16, 1981, KDC entered into a letter of commitment with AID.  By its terms, AID was to act as the project's financier, making payment to KDC "in amounts not to exceed $18,000,000.00."  KDC and AID entered into a second letter of commitment on October 23, 1981.  Except for the fact that it authorized additional payments in an amount not exceeding $32,000,000, its terms were virtually identical to those contained in the first letter of commitment.

Both letters provided that payments to KDC would be made under the letters only upon KDC presenting the documentation (certification) described in Clause 60 of Part II of the contract.  This clause, as amended, stated in pertinent part:

(4) *Progress Payment:*
(a) Requests for progress payments shall be submitted monthly by the Contractor [3] to the Engineer.  This request shall include a cumulative amount and the current month's amount of work completed for each bid item for which payment is being requested. Also to be included with each request for payment are AID forms 1440–3 and SF 1034.
(b) The Engineer shall, within 15 working days after receipt of each invoice, either indicate in writing its certification of payment due and present the statement to the Employer and a copy to AID, or return the statement to the Contractor indicating in writing its reasons for refusing such certification of payment.  In the latter case, the Contractor shall make the necessary corrections and resubmit the statement.

\*　　\*　　\*　　\*　　\*　　\*

(d) Upon receipt of the request for payment and certification AID will promptly pay the Contractor the certified amount less retention.  Retention of 10% of the certified amount shall be deducted and retained up to a limit of $1,000,000.

\*　　\*　　\*　　\*　　\*　　\*

(9) *Engineers Certifications*
The Engineer's certification of any payment requested will constitute a representation by it to the Employer, based on the Engineer's on-site observations of the work in progress and on its review of the request and the accompanying data, that the work has progressed to the point indicated and that, to the best of its knowledge, information and belief the quality of the work is in accordance with the Contract.  The Engineer may refuse to certify the whole or any part of any payment if, in its opinion, it would be incorrect to make such representation to the Employer.

2.  The contract defined the term "Engineer" as IECO and "Employer" as BADC.

3.  The contract defined the "Contractor" as KDC.

Clause 67 of Part I of the contract provided a binding arbitration mechanism for the settlement of disputes. If the contractor did not appeal and request arbitration within 90 days of notice of IECO's adverse decision on a disputed matter, the decision would remain final and binding. Arbitration was to be settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce. The clause provided in pertinent part:

If any dispute or difference of any kind whatsoever shall arise between the Employer and the Contractor or the Engineer and the Contractor in connection with, or arising out of the Contract, or the execution of the Works, whether during the progress of the Works or after their completion and whether before or after the termination, abandonment or breach of the Contract, it shall, in the first place, be referred to and settled by the Engineer who shall, within a period of ninety days after being requested by either party to do so, give written notice of his decision to the Employer and the Contractor. Subject to arbitration, as hereinafter provided, such decision in respect of every matter so referred shall be final and binding upon the Employer and the Contractor and shall forthwith be given effect to by the Employer and by the Contractor, who shall proceed with the execution of the Works with all due diligence whether he or the Employer requires arbitration, as hereinafter provided, or not. If the Engineer has given written notice of his decision to the Employer and the Contractor and no claim to arbitration has been communicated to him by either the Employer or the Contractor within a period of ninety days from receipt of such notice, the said decision shall remain final and binding upon the Employer and the Contractor. If the Engineer shall fail to give notice of his decision, as aforesaid, within a period of ninety days after being requested as aforesaid, or if either the Employer or the Contractor be dissatisfied with any such decision, then and in any such case

either the Employer or the Contractor may within ninety days after receiving notice of such decision, or within ninety days after the expiration of the first-named period of ninety days, as the case may be, require that the matter or matters in dispute be referred to arbitration as hereinafter provided. All disputes or differences in respect of which the decision, if any, of the Engineer has not become final and binding as aforesaid shall be finally settled under the Rules of Conciliation and Arbitration of the International Chamber of Commerce by one or more arbitrators appointed under such Rules. The said arbitrator/s shall have full power to open up, revise and review any decision, opinion, direction, certificate or valuation of the Engineer.

After all of the requisite documents were executed, KDC commenced work on the project. At some point thereafter, IECO, acting in its capacity as BADC's agent, issued several change orders modifying the scope of the work. Some of these change orders resulted in the deletion of certain work which had been included in the contract's original scope.

On or about November 16, 1983, KDC submitted two claims to IECO for certification that KDC was entitled to receive additional payments from BADC. Succinctly stated, KDC claimed: (1) that it was entitled to payment of certain "extra" costs that it purportedly incurred in furnishing the bank guarantee instrument required by BADC; and (2) that it was entitled to a price adjustment in connection with work deleted as a result of change orders issued by IECO. In December 1983, IECO denied both of these claims.

Thereafter, on March 12, 1984, KDC filed its complaint in this Court.

### Discussion

The plaintiff's complaint alleges that the United States breached the construction contract entered into between KDC and

BADC on the two claims at issue.[4] It asserts, in paragraph 30 of Count I, that AID's "failure and refusal to compensate plaintiff for the extra costs incurred in providing the 100% bank guarantee and additional endorsement was a breach of the construction contract, to which the Defendant is the real party in interest as the principal of its agent, BADC." Likewise it asserts, in paragraph 43 of Count II, that AID's failure to pay plaintiff for the price adjustments due because of the deleted work items was "a breach of the construction contract to which USAID is the real party in interest as the principal of its agent, BADC." These allegations, taken together, amount to a claim based on privity of contract, which allegations will be addressed in section I of this opinion.

In addition to the above allegations, the plaintiff's complaint alleges that AID's failure to compensate the plaintiff for the two claims are a breach of the express agreement (*i.e.*, the two letters of commitment) entered into between KDC and the United States. *See* paragraphs 31 and 44 of the plaintiff's complaint. These matters will be addressed in section II of this opinion.

As earlier indicated, the defendant has now moved for summary judgment. In that motion, the defendant has asserted two basic defenses that, in its view, would justify the Court's granting of its motions as a matter of law. The first assertion is that there is no privity of contract between the plaintiff and the defendant based on the construction contract itself under any express contract, implied-in-law, or implied-in-fact theory.

Second, the defendant has asserted that the letters of commitment do not allow for any express contract recovery either, since the plaintiff has failed to satisfy an essential condition precedent to recovery. The condition not satisfied by the plaintiff was the contractual requirement to obtain a cer-

tificate of payment due from the project manager/engineer (IECO) before seeking payment from AID. Since IECO had earlier denied both of these claims, the conditions precedent had not been accomplished and, thus, the defendant was not contractually obligated to pay for the disputed claims.

The defendant is correct as a matter of law on both of its assertions and, thus, is entitled to summary judgment.

I. The Construction Contract

■ For openers, this Court does not have jurisdiction over matters based on a theory of implied-in-law contract. *Merritt v. United States*, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925); *United States v. Minnesota Mutual Investment Co.*, 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911 (1926); *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 428 F.2d 1241 (1970). Thus, that theory is unavailable to the plaintiff in this Court.

■ Next, notwithstanding the plaintiff's allegations contained in paragraphs 30 and 43 of its complaint to the effect that AID was the "real party in interest" to the basic construction contract, AID clearly *was not* a party to the express contract that was executed between BADC and KDC on October 16, 1981.[5] That instrument was not signed by any representative of AID. Moreover, there was no meeting of the minds between BADC and KDC that AID would be a party to the contract. Indeed, as we have seen, the contract contained an express disclaimer in this regard. Clause 73 provided in part that "any decision by AID to exercise or refrain from exercising these approval rights shall be made as a financier in the course of financing this project and shall not be construed as making AID a party to the contract." Hence, AID was not a party to the express

---

4. Plaintiff claims some $2,329,804.88 due on the works deleted issue, and some $1,265,250.50 due on the bank guarantee/bond issue.

5. The plaintiff appears to have conceded or abandoned its breach claims based on the

Government being "the real party in interest" to the basic express contract entered into between BADC and KDC on October 16, 1981. *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment, at 4–6.

contract executed by BADC and KDC on October 16, 1981.

Moreover, to the extent that KDC is claiming that AID's activities led to the creation of an implied-in-fact contract between it and the United States, its argument also fails. First, in order to establish the existence of such a contract, KDC must show that there was a meeting of the minds. *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 508 F.2d 817 (1974); *Operational Manuals, Inc. v. United States*, 205 Ct.Cl. 854 (1974). This it has not done and cannot do. As we have seen, Clause 73 of the construction contract specifically provided that AID's activities were not to be construed as making it a party to the contract. Therefore, by signing that instrument, KDC and BADC signified that they had not entered into an implied contractual relationship with the United States.

■ Second, closely analogous decisions of both this Court and its predecessor demonstrate that a high degree of involvement by a Government agency in a project will not serve to create an implied-in-fact contract between the United States and a private party where the United States is not a party to the underlying contract. This doctrine was most recently stated by the Claims Court in *Penn Towne Builders, Inc. v. United States*, 4 Cl.Ct. 677 (1984). There, Penn Towne, a general contractor, had entered into a construction contract with the owner of an apartment project. The project owner then entered into a mortgage agreement with a private lender to finance the job. In return for a number of restrictions on the project owner's use of the funds, the United States Department of Housing and Urban Development (HUD) entered into a regulatory agreement whereby it agreed either to reinsure the mortgage note or to consent to the assignment of the mortgaged property. Penn Towne was not a party to either the mortgage contract or to the regulatory agreement. Problems ultimately developed with the construction, and HUD terminated the contract between Penn Towne and the project owner in accordance with the terms of the regulatory agreement. *Id.* at 679–80.

Penn Towne filed an action with the Claims Court, alleging that HUD's deep involvement in the project created an implied-in-fact contract between it and the United States. As the Court noted, "plaintiff contends that because HUD supplied the conditions and specifications for the work to be done, mandated its approval before payments were disbursed, and assertedly guaranteed payment under a 'guarantee' agreement, an implied-in-fact contract arose between plaintiff and HUD." *Id.* at 683. Conceding a "high degree of involvement by HUD" in this project, the Claims Court rejected Penn Towne's argument. It stated:

Plaintiff's theory, under the facts of this case, is not novel. Claims similar to the case at bar, where the federal government has subsidized state and local social welfare programs and where other contractors sought to recover damages from the United States, are legion. Although it is incontestable that HUD supervised and controlled many aspects of the Harmony House project, it is well settled law that where the United States is not a *party* to a contract, "no express or implied contracts result between the United States and those who will ultimately perform the work." *Aetna Casualty, supra,* 228 Ct.Cl. at 152, 158 F.2d 1047 [sic] [correct cite is 655 F.2d at 1052]. *See, D.R. Smalley & Sons, Inc. v. United States,* 178 Ct.Cl. 593, 372 F.2d 505, *cert. denied,* 389 U.S. 835, 88 S.Ct. 45, 19 L.Ed.2d 97 (1967). This doctrine finds it seminal precepts as far back as *Jones v. United States,* 1 Ct.Cl. 383 (1865), and was manifestly enunciated in *D.R. Smalley, supra*—a case involving federal highway construction funds. In *Smalley,* the court explained:

It is well established that the Federal Government is not liable for damages resulting from sovereign acts performed by it in its sovereign capacity. *Horowitz v. United States,* 267 U.S.

458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925); *Jones v. United States*, 1 Ct.Cl. 383 (1865).

The National Government makes many hundreds of grants each year to the various states, municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise, the will of Congress would be thwarted and the taxpayers' money would be wasted. *See Mahler v. United States*, 306 F.2d 713, 716–22 (3rd Cir.1962), *cert. denied*, 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231. These grants are in reality gifts or gratuities. It would be farfetched indeed to impose liability on the Government for the acts or omissions of the parties who contract to build the projects, *simply because it requires the work to meet certain standards and upon approval thereof reimburses the public agency for a party of the costs.*

\* \* \* \* \* \*

The sovereign acts of the defendant described above do not impose liability on defendant for acts and omissions of the State of Ohio on the theory of implied contracts. The contracts were between the state and the plaintiff. [178 Ct.Cl. at 597–598, 372 F.2d 505.] [Emphasis supplied.] [Footnote omitted.]

*Id.* at 683–84. *Accord Aetna Casualty and Surety Company v. United States*, 228 Ct.Cl. 146, 655 F.2d 1047, (1981). *See also Brannan v. United States*, 7 Cl.Ct. 399 (1985).

The principle established in *Penn Towne*, and the other decisions cited therein, is directly applicable to the facts of this case. Assuming for the purposes of argument that AID was deeply involved in the construction project at issue here, it was still not a party to the underlying contract between BADC and KDC. Therefore, KDC cannot rely upon that instrument as creating either an express or an implied contractual relationship between it and the United States. Stated another way, there is no privity of contract between the Government and KDC based on the underlying contract between BADC and KDC, and, thus, no basis for recovery thereunder for the plaintiff.[6]

## II. Letters of Commitment

In paragraphs 31 and 44 of the complaint, plaintiff asserts that AID's failure to compensate it for the two claims are a breach of an express agreement (*i.e.*, the two letters of commitment) entered into between KDC and the United States.

■ The Government counters this argument, however, by alleging in its summary judgment motion that the plaintiff has failed to meet an essential condition precedent which was mandatory before it is under any contractual obligation to pay the plaintiff for its claims. The condition not satisfied by the plaintiff was the contractual requirement to obtain a certificate of payment due from the project manager/engineer (IECO) before seeking payment from AID. Since IECO had earlier denied both of these claims, the condition precedent had not been accomplished and, thus, the defendant was not contractually obligated to pay for the disputed claims.

---

**6.** The Court notes in passing that the plaintiff has relied extensively on *Heyer Products Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956); and *Keco Industries, Inc. v. United States*, 192 Ct.Cl. 773, 428 F.2d 1233 (1970), in presenting its opposition arguments to the Court. It is difficult for this Court to discern, however, how either one of these cases have any applicability to the matter now before the Court.

The cited cases deal with the duty on the part of the Government to deal fairly and honestly with bids submitted by disappointed bidders. Here the plaintiff is not a disappointed bidder. The plaintiff won the contract. It therefore is governed by the contracts it agreed to; not by any implied-in-fact theories of contract applicable to disappointed bidders.

In support of its position, the Government points to paragraphs 1 and 2 of the letters of commitment[7] which state:

1. At the request of the Government of the Peoples' Republic of Bangladesh (hereinafter BDG), the Administrator Agency for International Development (hereinafter A.I.D.), acting for the United States of America, hereby guarantees subject to compliance with conditions hereinafter set forth, to make payment to you in amounts not to exceed $18,000,000.00 to cover costs of the contract of October 16, 1981 between yourselves and the Government of the Peoples' Republic of Bangladesh acting through Bangladesh Agriculture Development Corporation.

2. Payment shall be made hereunder in accordance with the payment schedule and upon compliance with the documentation requirements set forth in Clause 60 of the contract, which by way of reference is hereby incorporated into the terms of the Letter of Commitment. *Upon receipt of the required documentation, reviewed and approved by the BDG, and administratively approved by the A.I.D. Project Officer, the Controller will arrange for payment to be made by U.S. Treasury check payable to the contractor* to be issued and mailed to the contractor by the Regional Finance Officer, Bangkok. [Emphasis added.]

Clause 60, Part II, as amended, of the contract called for the project manager/engineer (IECO) to certify all requests for payments due (*i.e.* claims) from the contractor within 15 days, and send a copy of such certification to AID. Upon receipt of the request for payment and certification, AID would promptly pay the contractor the certified amount. Section 9 of Clause 60, Part II, as amended, further stated:

The Engineer's certification of any payment requested will constitute a representation by it to the Employer, based on the Engineer's on-site observations of the work in progress and on its review of the request and the accompanying data, that the work has progressed to the point indicated and that, to the best of its knowledge, information and belief the quality of the work is in accordance with the Contract. *The Engineer may refuse to certify the whole or any part of any payment if, in its opinion, it would be incorrect to make such representation to the Employer.* [Emphasis added.]

Although the Government concedes (as it must) that the letters of commitment constitute a binding contract[8] between KDC and itself, it alleges that the condition precedent explicit in the contractual section discussed above was not met, and hence there was no breach of its contractual obligation to pay the plaintiff. KDC, for its part, concedes that the project manager/engineer (IECO) had denied its claims, and, thus, no certification had been issued to BADC with a copy to AID. However, plaintiff denies that the certification is a contractual condition precedent to its recovery from the Government. KDC apparently believes that it has a contractual right to demand payment from AID without first receiving IECO's certificate—the first step in the payment process. The plaintiff's theory, of course, would read out of the contract the express terms of paragraph 2 of the letters of commitment.

The plaintiff, however, is simply wrong in its reading of this contract. As a matter of law, there is a condition precedent spelled out in the letters of commitment. The plaintiff must receive a certificate of payment due as specified under the contractual terms of the agreements at issue and present that certificate, along with its claim to AID, before it can recover from

---

7. Paragraphs 1 and 2 of both letters of commitment are identical with the exception of the amounts involved that are guaranteed. The October 16, 1981 letter guaranteed $18,000,000 whereas the October 23, 1981 letter guaranteed an additional $32,000,000.

8. *See Raymond Constructors of Africa, Ltd. v. United States*, 188 Ct.Cl. 147, 165, 411 F.2d 1227, 1236 (1969).

the Government. At this point, the Government has not breached any contractual obligation.

Plaintiff attempts to make the argument that the language contained in the letter agreements and the basic contract are not explicit enough to spell out a condition precedent. Although this Court does not know exactly how explicitly the plaintiff feels a condition must be spelled out, it appears to this Court that it was spelled out *very plainly.* The *Restatement of Contracts* indicates that:

No particular form of language is necessary to make an event a condition, although such words as "on condition that," "provided that" and "if" are often used for this purpose. An intention to make a duty conditional may be manifested by the general nature of an agreement, as well as specific language.

2 *Restatement of Contracts, Second,* § 226 (1981).

In addition to the contract language itself that spells out the condition precedent, the plaintiff's conduct demonstrates that the certificate requirement constituted a condition precedent and that it was so understood by all parties to the agreements. On November 16, 1983, the plaintiff initially submitted its two claims at issue here to the project manager/engineer (IECO) to obtain his approval and certification. On December 13, 1983, IECO, in writing, denied the plaintiff's claim as to the 100 percent bank guarantee matter, and on December 21, 1983, he denied, in writing, the plaintiff's work deletions cost claim. The plaintiff's conduct in this regard clearly indicates that it understood that any claim had to be presented first to the project manager/engineer (IECO) for his approval and certification *before* it could be presented to AID.

Furthermore, the plaintiff can hardly argue that presenting its claim first to IECO amounts to a dead-end procedure. This is true because the basic contract contained a mechanism by which disputes between the parties could be resolved. Clause 67 of Part I of the basic contract required that

*all disputes* between the project manager/engineer (IECO) and the contractor should be resolved first by IECO. If that resolution was unacceptable, the contractor would have 90 days in which to appeal to an arbitration panel. Under Clause 67, the arbitration was to be mandatory and final. If the plaintiff felt aggrieved by IECO's denials of its two claims, it had the right, indeed the duty, to appeal those denials through the arbitration procedure called for by the contract. Clearly the arbitration panel had the final authority to issue the critical certificates of payment to AID if the plaintiff had prevailed in its appeals before the panel. Not having utilized the contractually provided dispute process, the plaintiff's claims became final when not appealed to arbitration and it has no basis for claiming breach of the contract by AID for lack of payment. The only contractual obligation AID had was to pay KDC upon receipt of a proper certification. AID had no role to play in the dispute resolution process. ·See *Raymond Constructors of Africa, Ltd. v. United States,* 188 Ct.Cl. 147, 166, 411 F.2d 1227, 1237 (1969).

Thus, it is crystal clear that there was a condition precedent involved in this matter, and that the plaintiff had not satisfied that condition precedent before submitting its claims to AID under the letters of commitment. Because this is so, the Government has not breached its express contract with KDC, and the plaintiff is not entitled to recover from it under the letters of commitment.

Plaintiff's final shot for preserving its claims before this Court is contained in its argument that even if obtaining the project manager/engineer's (IECO's) certificate is a condition precedent to its recovery, such condition should be excused because of IECO's collusion with BADC. The problem with this parting shot argument is that the plaintiff does not support it with any credible evidence. The Government, with its motion, filed a sworn affidavit executed by Mr. F.E. Isgrig, who was the project manager/engineer (IECO) for the project in

Bangladesh. In that affidavit, Mr. Isgrig states in pertinent part:

8. By a letter dated December 13, 1983, IECO notified KDC that its Claim (A) was denied by IECO, and explained in detail the reasons for that decision. (A copy of this letter is attached hereto as Exhibit 1.) On December 21, 1983, IECO wrote a second letter to KDC which advised KDC that its Claim (B) had also been denied for reasons stated fully in that letter. (A copy of the letter is attached hereto as Exhibit 2.)

9. *IECO denied KDC's Claims (A) and (B) because, in IECO's judgment, they were not valid claims under the provisions of the Construction Contract. This finding was made independently in IECO's capacity as Engineer, without influence from any other party.* [Emphasis supplied.]

Plaintiff offers nothing of a direct nature to counter this assertion. It merely attaches a part of a deposition of a former AID official in Bangladesh, a Mr. James Rogan, that does not in any way support the plaintiff's point of collusion in the project manager/engineer's (IECO's) decisions to deny the plaintiff's claims. As this Court has stated in a recent opinion:

[O]nce the moving party has produced evidence which apparently establishes a material fact, the non-movant may not discharge his burden by cryptic, conclusory or generalized responses, * * *, or by remaining silent. [Citations omitted.]

*Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 392 (1984). *See also Idaho Migrant Council, Inc. v. United States,* 9 Cl.Ct. 85, 87 (1985).

The plaintiff has not adequately supported his charge of collusion.

## CONCLUSION

For the reasons stated in the opinion, the Court concludes that there is no genuine issue as to any material fact essential to the disposition of the case, and that the defendant is entitled to a judgment as a matter of law. The defendant's motion for summary judgment is therefore granted. The plaintiff's complaint will be dismissed.