**SOUTHEAST NURSING HOME, INC., a corporation, Plaintiff-Appellant,**

v.

**The ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant-Appellee.**

No. 83–7131.

United States Court of Appeals, Eleventh Circuit.

Jan. 24, 1985.

James E. Clark, London, Yancey, Calrk & Allen, Birmingham, Ala., for plaintiff-appellant.

Marshall H. Fitzpatrick, Norman, Fitzpatrick & Wood, Robert D. Norman, Birmingham, Ala., for defendant-appellee.

Before TJOFLAT, HILL and JOHNSON, Circuit Judges.

TJOFLAT, Circuit Judge:

This is a diversity action by an insured, Southeast Nursing Homes, Inc., against its insurer, The St. Paul Fire and Marine Insurance Company, to recover damages under an insurance policy for an insured fire loss and, in addition, punitive damages for the allegedly tortious manner in which the insurer dealt with the loss. The district court, following a pretrial hearing, concluded that the insured's suit on the policy was premature, because the claim was subject to arbitration which had not taken place, and that its tort allegations were unfounded; the court therefore gave the insurer summary judgment. We conclude that summary judgment was called for in this case and accordingly affirm.

## I.

In August 1978, Southeast Nursing Homes, Inc. purchased an insurance policy from The St. Paul Fire and Marine Insurance Company which provided Southeast with protection against numerous perils, including fire damage to its nursing home and contents located in Lineville, Alabama. The nursing home was insured for $513,000, its contents for $50,000. In December of that year, the nursing home and a portion of its contents were partially destroyed by fire. Southeast notified St. Paul of the loss and St. Paul, admitting that the loss was covered, promptly referred the matter to its adjuster, General Adjustment Bureau (GAB).

The insurance policy required St. Paul to pay Southeast the cost of repairing the nursing home and its contents or replacing the damaged portions with property of like kind and quality. GAB obtained an estimate to repair the building for $67,639.75 and another estimate of $34,739.20 to replace the damaged contents. Dissatisfied with these estimates, Southeast obtained its own estimates, which totaled $209,656.00. St. Paul, considering the disparity between these estimates, requested GAB to obtain another repair bid. GAB obtained a second estimate to repair the building of $71,077.67; it stood by its original $34,739.20 appraisal of the contents loss. Southeast refused to accept either of these amounts in settlement of its loss and demanded that the dispute be settled by "arbitration," as provided for in its policy.[1] The policy's arbitration clause, written in "plain English," read:

*Arbitration of property disputes*

If agreement can't be reached on the amount of your loss, the following procedure will be used:

1. One of us will make a written demand for arbitration.

2. Each will select an appraiser and decide on a reasonable time and place for an appraisal of the loss and damage.

3. The appraisers will agree on a competent and impartial umpire. If they can't agree on an umpire within 15 days, a judge in the state where the appraisal is to be held will be asked to pick one.

4. The appraisers will each compute the loss and state the actual cash value of the property at the time of loss and the amount of loss. If they don't agree, they'll submit their appraisals to the umpire. Agreement of two out of three will decide the amount of the loss.

You'll pay your appraiser and we'll pay ours. And other costs of the appraisal and the umpire will be equally divided between us.

---

1. One of the issues in this case is whether the "arbitration" contemplated under the policy is an appraisal or a formal arbitration within the meaning of Chapter 6, Article 1, "Arbitration and Award," of the Code of Alabama. *See infra* discussion in Part II. A. We conclude that the parties contemplated an appraisal. In our discussion *infra*, we sometimes refer to this appraisal process as arbitration.

We won't be held to have waived any of our rights under this policy because of the appraisal.

Suits against us

You agree not to sue us to recover under this policy unless you've lived up to all its terms.

When it received Southeast's demand for arbitration, St. Paul, acting in accordance with this provision, selected an appraiser, John Vinsant, who assessed the damage to the building at $72,669.02. (He did not reassess the damage to the contents, previously estimated, as we have indicated, at $34,739.20.) Southeast did not appoint an appraiser; instead, it decided to forego arbitration and to bring this suit against St. Paul.

Southeast's complaint contained a simple contract claim; it alleged that St. Paul had breached the insuring provisions of its policy by refusing to pay a covered loss, in the amount of $275,000. St. Paul moved to dismiss the action as premature on the ground that Southeast, having sought arbitration of its claim, had to complete the arbitration process before it could bring suit under the policy. To avoid this problem, Southeast amended its complaint to allege that St. Paul had waived its right to arbitration because it had unconditionally refused to pay Southeast, as required by the policy, the cost of repairing the nursing home and its contents or replacing the damaged portions with property of like kind and quality.

In its amended complaint, Southeast also presented two additional claims. First, it alleged that St. Paul's conduct in refusing to pay the loss amounted to fraud and deceit and that St. Paul was liable for punitive damages in addition to the amount due under the policy. Second, it alleged that St. Paul, in refusing to pay the loss, had committed, and was continuing to commit, the tort of "bad faith." Again, Southeast sought to recover the full amount of its loss plus punitive damages.

After Southeast amended its complaint, the district court, treating St. Paul's earlier motion to dismiss as a motion for summary judgment under Fed.R.Civ.P. 12(c),[2] gave St. Paul summary judgment on Southeast's policy claim.[3] The court agreed with St. Paul that this claim was premature because the arbitration called for by the policy had not run its course. The fact that St. Paul's estimates were much lower than Southeast's did not, in the court's view, permit the inference, urged by Southeast, that St. Paul did not intend to honor its contractual obligations to Southeast and had, consequently, waived its right to arbitration.

Following this ruling, St. Paul moved the court to dismiss Southeast's fraud and deceit and bad faith claims. The court denied the motion as to the fraud and deceit claim, concluding that the facts Southeast alleged stated a prima facie case, but granted it as to the bad faith claim, since Alabama law[4] did not recognize the tort of bad faith.

With the case in this procedural posture, Southeast made several attempts to resurrect its claim under the insurance policy. First, Southeast moved the court to retain jurisdiction over that claim while it was in arbitration, so that the court could resolve any dispute that might arise out of the arbitration process. The court granted the motion, stating that it would hold the claim "in abeyance" pending arbitration.

---

2. Fed.R.Civ.P. 12(c) provides in pertinent part: If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
Southeast had attached several evidentiary exhibits to its amended complaint in an attempt to substantiate its claims.

3. Although the district court's dispositive order did not explicitly state that Southeast's claim was being dismissed without prejudice, it is clear to us from a reading of the order as a whole that the court intended such a disposition.

4. The district court and the parties treated each of Southeast's claims in this case as being controlled by Alabama law. We accordingly do likewise in deciding this appeal.

Second, Southeast moved the court to disqualify St. Paul's appraiser, Vinsant, arguing that he "would have difficulty being impartial," as he had previously performed work for GAB and allegedly had made a proposal to St. Paul to repair Southeast's property. The court denied the motion. The court concluded that it could not determine from the language of the insurance policy's arbitration clause whether the parties' appraisers had to be impartial and that Southeast could raise the issue of Vinsant's bias later, if, after receiving the arbitration award, it decided to challenge that award judicially, on the ground that the insurer's appraiser was partial.

Third, Southeast moved the court to vacate its summary judgment on the policy claim and to determine the amount St. Paul owed it under the policy. Southeast tendered an amended complaint which restated its original policy claim and alleged, in addition, that the claim was ripe for adjudication because St. Paul, in selecting a partial appraiser, Vinsant, had waived its right to arbitration. Southeast pointed to a number of Alabama cases and Alabama Code § 6–6–6 (1975),[5] not previously cited to the court, which, it contended, required that all appraisers be impartial. Southeast also requested the court to reconsider its previous ruling that Alabama did not recognize the tort of bad faith, citing an intervening decision of the Alabama Supreme Court, *Chavers v. National Security Fire & Casualty Co.*, 405 So.2d 1 (Ala.1981), which acknowledged such a cause of action. According to Southeast, St. Paul's selection of a biased appraiser and its refusal to pay at least the amount of the loss not in dispute constituted bad faith.

The district court denied Southeast's motion to relitigate its claim on the insurance policy by amending its complaint. In doing so, the court nevertheless considered and rejected the merits of Southeast's proposed amendment. The court assumed that Vinsant was biased, as Southeast alleged, and that Alabama law proscribed biased appraisers, but concluded that St. Paul's appointment of a biased appraiser could not have constituted a breach of the insurance contract and thus a waiver of its right to arbitration. *Simonetti v. Niagara Fire Insurance Co.*, 74 F.Supp. 726, 729 (N.D. Ala.), *aff'd*, 164 F.2d 878 (5th Cir.1947). The court did, however, reinstate Southeast's bad faith claim in light of the Alabama Supreme Court's *Chavers* decision.

Southeast's final attempt to resurrect its claim under the insurance policy came when it moved the court to enter a partial summary judgment for $109,145.81, the amount, with interest, which, apparently, St. Paul had previously offered to pay. Southeast argued that St. Paul's right to arbitration applied only to the portion of damages in dispute; it did not apply to the uncontested portion. The court granted Southeast's motion and entered a partial summary judgment in that sum.

At this point, the district court judge presiding over the case, Chief Judge McFadden, resigned from the bench, and the case was assigned to Judge Acker. Once again Southeast sought leave to amend its complaint to renew its claim under the policy; it also asked the court to revisit Judge McFadden's ruling that St. Paul, in designating a partial appraiser, had not waived its right to arbitration.

Judge Acker re-examined Judge McFadden's ruling and, in a written order, concluded, as had Judge McFadden, that St. Paul had not waived its right to arbitration and that Southeast's policy claim was, accordingly, premature. The basis of Judge Acker's decision differed from Judge McFadden's, however. Judge Acker decided that St. Paul's appointment of a partial appraiser could not have operated to waive its contract right to arbitration because neither the insurance contract nor Alabama

---

**5.** Section 6–6–6, which is part of Chapter 6, Article 1, "Arbitration and Award," of the Code of Alabama, provides:

Before making their award, the arbitrators must be sworn impartially to determine the matters submitted to them, according to the evidence and the manifest justice and equity of the case, to the best of their judgment and without favor or affection, which oath they may administer to each other or may be administered to them by any officer authorized to administer oaths.

law required that the parties' appraisers be impartial. The contract provided that "the *appraisers* will agree on a competent and *impartial* umpire" (emphasis added by district court); this, according to Judge Acker, gave rise to the inference that the parties' appraisers could be partial. Alabama law did not provide otherwise. As Judge Acker observed, Ala.Code § 6–6–6, which mandates that an arbitrator take an oath that he will be impartial when making an award, does not require that the arbitrator "*in fact be* totally impartial in the sense that he never had any connection whatsoever with the party who chooses him." (Emphasis in original.) Rather, it only requires that he swear to such impartiality before making the award. Whether St. Paul's appraiser could take such an oath, the judge reasoned, could only be determined if arbitration were allowed to proceed.

Judge Acker also re-examined Judge McFadden's ruling on St. Paul's motion to dismiss Southeast's fraud and deceit and bad faith claims. Speaking first to the bad faith claim, he noted that the Alabama Supreme Court, in two recent decisions, had severely circumscribed its *Chavers* holding, which had recognized the tort of bad faith. A bad faith claim cannot lie unless " 'the insurer lack[ed] a legitimate or arguable reason for failing to pay the claim,' " *National Security Fire & Casualty Co. v. Bowen,* 417 So.2d 179, 183 (Ala. 1982) (citing *Gulf Atlantic Life Insurance Co. v. Barnes,* 405 So.2d 916, 924 (Ala. 1981)), or, stated differently, "the proof [established] that the [insured was] entitled to a directed verdict on the claim and, thus, entitled to recover on the contract claim as a matter of law." *National Savings Life*

*Insurance Co. v. Dutton,* 419 So.2d 1357, 1362 (Ala.1982). Under these holdings, Judge Acker concluded, Southeast's bad faith claim had no basis because the record conclusively established that St. Paul had properly exercised its contract right in insisting that Southeast's claim be arbitrated. Thus, St. Paul clearly had a lawful reason for not acceding to Southeast's $275,000 demand.

Judge Acker treated St. Paul's earlier motion to dismiss Southeast's bad faith claim as a motion for summary judgment and granted summary judgment in St. Paul's favor. The court also gave St. Paul summary judgment on Southeast's fraud and deceit claim, holding that this claim constituted nothing more than a replication of Southeast's bad faith claim. Judge Acker entered a final judgment in accordance with his summary disposition of Southeast's three claims, and Southeast took this appeal.[6] It asks us to vacate the final judgment and to direct the district court to proceed to the merits of each of its three claims, the claim under the insurance policy and the tort claims for bad faith and fraud and deceit. We consider these claims *seriatim.*

## II.

### A.

Southeast contends that St. Paul waived its right to arbitrate Southeast's loss; therefore, the district court should have entertained, and decided, its policy claim in full. St. Paul's waiver purportedly occurred when, in contravention of the Alabama Code provisions governing arbitra-

---

**6.** Our jurisdiction rests on 28 U.S.C. § 1291 (1982). The district court intended to, and did, dispose of this case by entering a final judgment on all claims. In his memorandum opinion that accompanied his dispositive order, Judge Acker stated that, "the effect of this opinion and the accompanying order, taken with the previous orders entered by Judge McFadden, is to *finally* adjudicate all of Southeast's claims in favor of the defendant, St. Paul .... (Emphasis added.)

As to count one, the court gave Southeast a money judgment in the sum of $109,145.81, for the undisputed portion of its loss and dismissed

*without prejudice* Southeast's claim in excess of that sum because that portion of the loss was subject to arbitration in accordance with the policy. We have not been cited to, nor have we found any authority for, such a "final judgment," which is somewhat bizarre in the sense that it split Southeast's policy claim, without prejudice to the parties' right later to challenge the arbitration award, presumably in state or federal court. The court's judgment is, nonetheless, final on count one, bringing that claim to an end. As to counts two and three, the court's dispositive order left nothing for a later day.

tion, it appointed a partial appraiser, Vinsant, to assess Southeast's loss.

To hold for Southeast on this issue, we must conclude, first, that the insurance policy, read in the light of Alabama law, required the parties to select impartial appraisers and, second, that Vinsant could not have been impartial as a matter of law.[7] Because we find that the policy did not require impartial appraisers, we do not reach the question of whether Vinsant could have acted impartially.

■ The Supreme Court of Alabama has recently recognized a distinction between an appraisal and an arbitration and has held that appraisals are not controlled by the arbitration provisions of the Alabama Code. Rather, appraisals are controlled by the relevant provisions of the parties' contract. Whether a contract calls for an appraisal or arbitration is a matter of contract interpretation; the court must discern the parties' intent.[8] In determining their intent, the court should give considerable weight to the nature of the issues the parties selected to "arbitrate" and the procedures the "arbitrators" must follow in reaching their decision. *Casualty Indemnity Exchange v. Yother*, 439 So.2d 77, 79 (Ala.1983).

■ In *Yother*, the Alabama Supreme Court, commenting on the procedures employed in appraisals, observed that appraisers typically "act without hearing or judicial inquiry" and decide the issues "upon their own knowledge or information acquired independent of the evidence of witnesses; ... they may reach individual conclusions and are required to meet only for the purpose of ironing out differences in the conclusions they reached." *Id.* at 79, 80. Describing the nature of the issues resolved by appraisal, the court noted that although "arbitration ordinarily encompasses the disposition of the entire contro-

versy ... appraisal extends *merely to the resolution of the specific issues of actual cash value and the amount of loss*, all other issues being reserved for determination in a plenary action before the court." *Id.* at 80 (emphasis added). In the case at hand, the parties' intent is easily discernible from a reading of the insurance contract and therefore was a pure question of law for the district court. *Travelers Insurance Co. v. Kernachan*, 214 So.2d 447, 449 (Ala.1968); *Foster & Creighton Co. v. Box*, 66 So.2d 746, 750 (Ala.1953).

■ Southeast argues that the title of the provision of the policy now in dispute, "Arbitration of Property Disputes," conclusively established that the parties intended to arbitrate the type of controversy they now present. We are not persuaded. Like other courts that have encountered this argument, we conclude that the use of the words "appraisal" or "arbitration" in a contract is not conclusive on the issue of intent. *Penn Central Corp. v. Consolidated Rail Corp.*, 82 A.D.2d 208, 441 N.Y.S.2d 266, 269–70 (N.Y.App.Div.1981); *Matter of Katz*, 11 A.D.2d 89, 201 N.Y.S.2d 996 (N.Y. App.Div.1960), *aff'd*, 9 N.Y.2d 799, 215 N.Y.S.2d 510, 175 N.E.2d 168 (N.Y.1961).

■ The insurance contract here is a "plain English" policy; thus, its words should be given their plain, rather than legalistic, meaning. The dictionary defines arbitration as: "[T]he settlement of a dispute by a person or persons chosen to hear both sides and come to a decision." *Webster's New World Dictionary* (2d ed. 1972), at 70. With this definition in mind, the parties, in using the word "arbitration," could just as easily have intended an appraisal process as the formal arbitration proceeding described by the Alabama Code. This is particularly true given that they did not provide that the arbitration process

---

7. As a fall back position, Southeast contends that we must vacate the summary judgment on the policy claim and remand the case for trial if there is a question of fact as to Vinsant's partiality. Presumably, at the conclusion of the trial, the trier of fact would decide, first, whether Vinsant was impartial; then, if he was not, it would proceed to determine the disputed por-

tion of Southeast's loss. In view of our disposition of this appeal, we need not address this contention.

8. Neither party contends that there is any competent evidence, extrinsic to the contract, that would indicate the parties' intent.

would be governed by the Code, *see Rhodes v. Folmar,* 208 Ala. 595, 94 So. 745 (1922); *Tennessee Coal, Iron & R. Co. v. Roussell,* 155 Ala. 435, 46 So. 866 (1908), and they specified that the decision-makers would be "appraisers." If the parties' use of the word "appraisers" did not eliminate any doubt whether they intended an appraisal process or formal arbitration, we think the nature of the question they wanted appraised and the procedures the appraisers were to employ did so.

First, it is clear that the parties intended the appraisers to act upon their own knowledge and information, acquired from an independent investigation, such as the one Vinsant conducted, in arriving at the amount of an insured loss. Nowhere in the insurance policy does it appear that the appraisers are required to hear evidence from witnesses or hold a formal hearing or inquiry. Rather, they are to reach their own conclusions, meeting together only to iron out their differences. If they cannot come to an agreement, they must select an impartial umpire.

Second, the type of question referred to this process is precisely the type suitable for appraisal. As the court noted in *Yother,* 439 So.2d at 80, "appraisal extends merely to the resolution of the specific issues of actual cash value and the amount of loss, all other issues being determined in a plenary action by the court." The only issue subject to resolution under the "arbitration clause" here, the one Southeast seeks to litigate, is the actual cash value of Southeast's loss. The appraisers would have no authority to determine whether St. Paul is in fact liable for the loss; nor could they resolve any other controversy concerning the policy the parties might have. Indeed, it is difficult to imagine any dispute more amenable to appraisal resolution than the one now before us. In sum, we are faced with a contractual provision that calls for appraisers to resolve the sort of dispute typically handled by appraisers in a manner in which appraisers customarily operate.

The inescapable conclusion is that the parties contemplated an appraisal, not the formal arbitration procedure described in the Alabama Code.

The insurance policy, as Judge Acker held, does not require the parties to select impartial appraisers. Southeast does not contend that it does; its argument for impartial appraisers, which we reject, is founded solely on the Alabama Code's arbitration provisions. Accordingly, St. Paul's appointment of Vinsant, even if he turns out to be biased, did not operate as a waiver of its right to an appraisal resolution of Southeast's loss, and the district court was correct in so holding.

### B.

■ Judge Acker rejected Southeast's bad faith claim because, as a matter of law, St. Paul had a lawful basis for refusing to accede to Southeast's $275,000 settlement demand. Under Alabama law, an insurer cannot be held liable for the tort of bad faith unless he lacks "a legitimate or arguable reason for failing to pay the claim." *Gulf Atlantic Life Insurance Co. v. Barnes,* 405 So.2d 916, 924 (Ala.1981). "Bad faith, then, is not simply bad judgment or negligence, but … imports a dishonest purpose." *Id.* "In the normal case … the [insured must prove] that [he] is entitled to a directed verdict … and, thus entitled to recover on the contractual claim as a matter of law." *National Savings Life Insurance Co. v. Dutton,* 419 So.2d 1357, 1362 (Ala.1982).

■ Southeast contends that St. Paul was guilty of bad faith because it refused to pay Southeast the amount of the loss it conceded was not in dispute. The policy, however, did not require St. Paul to pay anything until the appraisal process was concluded and the parties' appraisers, or one of their appraisers and the impartial umpire,[9] decided "the amount of the loss." Southeast contended that its loss was

---

9. The policy's arbitration clause provides that, if the parties cannot agree on the amount of the loss and one party demands arbitration, each party will select an appraiser. Then, if the appraisers cannot agree, "they'll submit their appraisals to the [impartial] umpire. Agreement of two out of three will decide the amount of the loss." *See supra* Part I.

$275,000; St. Paul's estimate was far less. The policy provided that, if they could not agree, they would have to settle their dispute by "arbitration." The district court, in ordering Southeast to arbitrate, implicitly, if not explicitly, found that St. Paul had a legitimate basis for resisting Southeast's $275,000 demand, and we are convinced that the record clearly supports that finding. Consequently, Southeast had no bad faith claim.[10]

▮▮▮ The fact that the district court gave Southeast summary judgment for the undisputed portion of its claim does not detract from the court's finding on this critical bad faith issue. It is true, as we have observed in the margin, *see supra* note 6, this entry of summary judgment cannot be squared with the court's ruling that Southeast's claim was premature because it had not been subjected to the appraisal process. We are convinced, however, that Judge McFadden minted the summary judgment, and Judge Acker ratified it, not because they felt that St. Paul was guilty of bad faith or any other wrongdoing, but simply in an effort to do justice and to bring to an end a controversy that should never have reached the courthouse.[11]

### C.

Judge Acker summarily dismissed Southeast's fraud and deceit claim because it constituted nothing more than the bad faith claim with a different label. Alternatively, he found that Southeast had failed to state this claim with sufficient particularity, as is required by Fed.R.Civ.P. 9(b). Judge Acker's primary holding is the correct one.

According to Southeast's allegations, St. Paul was, and continues to be, guilty of fraud because it refused to pay Southeast the cost of repairing the nursing home and its contents or to replace the damaged portions with property of like kind or quality, as mandated by the policy. All the record indicates, however, is that St. Paul refused to accede to Southeast's $275,000 demand because, according to its estimates, Southeast's demand was exorbitant. This, the district court concluded, was insufficient as a matter of law to show that St. Paul did not intend to comply with the policy. The court's conclusion is unimpeachable, and it effectively, and properly, put to rest Southeast's fraud and deceit claim.

The judgment of the district court is AFFIRMED.

---

10. Southeast cites *Foster v. Western World Insurance Co.*, 339 So.2d 395 (La.Ct.App.1976) and *Cincinnati Insurance Co. v. Palmer*, 297 So.2d 96 (Fla.Ct.App.1974) as supportive of its bad faith claim. These cases are legally and factually inapposite. First, neither describes the state of the law in Alabama; rather, both pertain to specific statutory provisions in other states. Second, neither required that the insurance company pay the undisputed portion of the insured claim, as Southeast urged the district court to do here. Even in *Foster*, the factually more similar case, the Louisiana Court of Appeals, construing a Louisiana statute, held only that the insurer was required to pay the amount of the loss for the contents because the total amount of the contents loss was not disputed. It did *not* require the insurance company to pay the portion of the building loss it concedd it owed because the total amount of building loss was contested.

11. We note, in passing, that Southeast ran considerable risk in pushing the court to grant it a summary money judgment on the policy claim as to the $109,145.81 undisputed portion of the loss. A final judgment, as to which execution may issue, normally brings the claim to an end, especially if the judgment is satisfied. On the other hand, a judgment which awards damages but also allows the judgment holder to return to court to prove more damages is not a final judgment. *See International Controls Corporation*, 535 F.2d 742 (2d Cir.1976), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978). Under the judgment here, the court did not retain jurisdiction; rather, it dismissed the disputed portion of Southeast's policy claim without prejudice. In our view, especially in the light of Judge Acker's expressed intent that his dispositive order "finally adjudicate all of Southeast's claims," *see supra* note 6, the district court's judgment, for our appellate purposes, is indeed final.