Calvin A. **KELLEY**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 46–88C.

United States Claims Court.

Dec. 15, 1989.

---

Terence M. Ridley, Denver, Colo., Atty. of record for plaintiff. Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Denver, Colo., of counsel.

John S. Groat, with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, Washington, D.C., for defendant. David M. Cohen, Director, Mary Mitchelson, Asst. Director, and Mark Ezersky, Office of Contract and Property Law, U.S. Postal Service, Washington, D.C., of counsel.

## OPINION

FUTEY, Judge.

This case is before the court on defendant's motion for summary judgment and plaintiff's cross-motion for summary judgment. Plaintiff is seeking an order of ejectment and payment of all rent due and owing, plus interest, under the terms of a lease and lease modification. Defendant denies owing any sums to plaintiff and contends that an enforceable contract for sale was formed under the option to purchase provision of the lease. In addition, defendant counterclaims against plaintiff for the sum of $75,398.51, plus interest, for rent and real estate taxes on the property that defendant claims it erroneously paid.

### Factual Background

Plaintiff owns 1.5763 acres of real property on South Golden Road, Golden, Colorado, which is called the Carrier Annex site.[1]

On October 23, 1979, plaintiff and defendant entered into a lease with options beginning November 1, 1984, for up to three 5–year terms.[2] The rent for the first term, called the primary term, was set by the parties at $2,870.00 per month. At the end of each term, defendant had the option to renew the lease at a new rent based upon an appraised value of the property. In addition, at the end of the primary term, defendant had the option to purchase the property at an appraised value.

As the first term of the lease was drawing to a close, defendant gave notice of its intent to exercise its option to purchase the property (purchase option). The lease provides specific instruction on how to exercise the purchase option. Paragraphs 4 and 4(a) of the lease describe this process:

> 4. *Option to Purchase.* The Postal Service shall have the right and option to purchase the demised premises at the

---

1. "Real property" refers only to the land, since the building is owned by the defendant.

2. The lease is also called "the Ground Lease."

termination of the primary term for the new appraised value of the premises.

a. *Exercise of Option to Purchase.* The option to purchase the demised premises shall be exercised by causing to be delivered to the Owner, by certified or registered mail, written notice of the Postal Service's exercise of its option to purchase, and said notice shall be mailed to the Owner at least one hundred twenty (120) days prior to termination of the primary term.

The lease describes the method of evaluating the property for determining the new appraised value in paragraphs 5 and 5(a):

5. *"New Appraised Value."* Whenever in paragraphs 3 and/or 4 above, the term "new appraised value" is used, it shall mean a new value for the demised premises, which value shall be arrived at by appraisals, obtained as follows:

a. Within ten (10) days after receipt of the notice as provided for in paragraphs 3(a) or 4(a), both the Owner and the Postal Service shall notify each as to their selection of an independent real estate appraiser to value the demised premises. Each appraiser shall submit his or her appraisal of the demised premises not less than ninety (90) days prior to the termination of the lease term then in effect. Should these two appraisals agree, then the "new appraised value" shall be deemed to have been determined.

If the two appraisals do not "agree" as required in 5(a), a solution is found in 5(b):

b. In the event that the two appraisals as provided for in paragraph 5(a) do not agree, and in the event the parties hereto cannot mutually agree upon the value of the demised premises, the Postal Service and the Owner shall mutually agree upon a *third appraiser, who shall appraise the property, confer with the appraisers provided for in paragraph 5(a), review their appraisals and arrive at any appraisal valuing the demised premises. This appraisal* shall be delivered to the parties hereto not less than seventy-five (75) days prior to the termination of the lease term then in effect and *shall be binding upon the parties for the purposes of determining "new appraised value."*[3] [Emphasis added.]

On July 2, 1984, defendant gave plaintiff notice, pursuant to paragraphs 4 and 4(a), of its intent to exercise the purchase option and also of the selection of Bowes and Company (Bowes) as its appraiser. Thereafter, the parties continued to follow the instructions as provided in the above lease paragraphs. On July 19, 1984, Bowes appraised the market value of the land at $280,000.00. On July 24, 1984, plaintiff gave notice of the name of his appraiser, Bridwell and Company (Bridwell). In accordance with paragraph 5(a) of the lease, Bridwell should have released its appraisal by August 2, 1984. Instead, the appraisal was released months later, on February 27, 1985. It is unclear from the record why this delay occurred. However, defendant didn't object and continued paying rent at the primary term rate even after the lease terminated on November 1, 1984.

The record indicates that the parties negotiated a "lease modification agreement Number One" (lease modification) executed by the plaintiff on January 30, 1985, and accepted by defendant on February 5, 1985. It provided:

Beginning February 1, 1985, the terms of said lease shall be month to month until the sale of the property to the Postal Service or exercise of the Renewal Option by the Postal Service. In the event the sale is not consummated as provided for in the lease, the Postal Service may exercise the Option to Renew the lease in accordance with paragraph 3 of the lease except that the notice period for said option as set forth in paragraph 3(a) of the lease is waived by the parties and the Postal Service is granted 90 days subsequent to the parties notifying one another that the sale will not be consummated in which to exercise said renewal option.

---

**3.** The parties are in agreement that the phrase "any appraisal" in the emphasized area is a typographical error and should read "an appraisal."

Bridwell's appraisal of February 27, 1985, found the market value of the property to be $445,000.00. After reviewing the two appraisals, plaintiff and defendant could not agree on the price. The parties then resorted to the solution provided in paragraph 5(b) of the lease. Edward Earley and Associates (Earley) was mutually chosen as the third appraiser.

On May 31, 1985, Earley released its appraisal, valuing the property at $343,000.00 as of August 10, 1984. Earley did not consult with the two prior appraisers, Bridwell and Bowes, prior to completing its appraisal, although Earley was sent copies of both of their appraisals. Upon receiving the Earley appraisal, plaintiff alleged that various defects in the appraisal resulted in a substantial undervaluation of the property:

> The third appraisal, performed by Edward Earley, MAI [Member of the Appraisers Institute], failed to comply with the plain instructions contained in the Ground Lease and the standards of MAI appraisers. For example, Earley failed to confer with the two prior appraisers of the Subject Property, Bowes and Bridwell, prior to completing his Appraisal. Also, Earley relied primarily on a comparable sale which did not reflect the fair market value because it was based on a non-arm's length transaction. *Further, I [plaintiff] immediately alerted Mr. Earley to the deficiencies in his appraisal but he refused to modify his appraisal.*[4] [Emphasis added.]

However, instead of an increase in the appraised value of the land, the Earley appraisal was amended on June 24, 1985, to reflect a *reduction* based upon the alleged existence of an encumbrance which had not been previously considered. The third appraisal's amendment lowered the valuation of the property to $336.834.00.

On July 9, 1985, defendant once again announced that it had exercised the purchase option pursuant to paragraphs 4 and 4(a) of the lease. Asserting the Earley appraisal was binding as to the purchase price, defendant stated that a representative would contact plaintiff about closing the transaction. Thereafter, defendant opened an escrow account with Lawyers Title of Central Colorado, to make funds available to plaintiff. Defendant advised Lawyers Title that it would be forwarding $339,834.00 to the account which was the amount of money due plaintiff under the purchase option, plus an additional $3,000.00 to cover closing costs and a policy of title insurance. Defendant instructed Lawyers Title to invest the funds in an on-demand interest bearing account.

On July 17, 1985, plaintiff, through counsel, acknowledged receipt of the purchase option notice sent by defendant and informed defendant that the property would not be sold for $336,834.00 because of his objections with Earley's appraisal:

> In Mr. Kelley's opinion that appraisal [Earley] completely fails to reflect accurately the value of the property, for a variety of reasons. Among other things, it is Mr. Kelley's belief and understanding that the valuation should have been determined as of November 1, 1984, which was the end of the primary lease term. In addition, it appears that the appraisal completely ignored the most material comparable sales, which should have been taken into account in arriving at the evaluation. I am also advised that there was a reduction in price made by Mr. Earley because of a sidewalk which exists on the premises. That sidewalk was on the premises at the time of the initial lease, and therefore, pursuant to paragraph 5(e) of the lease, no reduction in price should have been made for that reason. Numerous other objections exist to the appraisal, which may be discussed at a subsequent time.

On August 19, 1985, defendant informed plaintiff that, under the lease, plaintiff was bound by the third appraisal. Seven months later, still unable to resolve this matter, defendant requested plaintiff to

---

4. Membership in the MAI is a requirement of all appraisers pursuant to paragraph 5(c). Plaintiff contends that Earley's appraisal failed to meet MAI standards. However, no clause in the lease required appraisers to perform up to the standards of MAI appraisers.

enumerate his disagreements with the third appraisal. In response, plaintiff sent a critique plus an alternative purchase price of $446,319.00. On June 10, 1987, plaintiff offered to sell the property for an aggregate amount of $430,650.00, consisting of the Earley appraisal value of $343,322.00,[5] plus a rental surcharge from the period November 1, 1984 through the date of the settlement.[6]

Subsequently, on November 3, 1987, plaintiff sent defendant a letter[7] stating that plaintiff had not received the October rent payment and that the letter constituted notice that defendant was in default under the lease modification. In addition, plaintiff claimed that the nonpayment of rent constituted a breach which gave plaintiff the right to cancel the lease. Plaintiff concludes: "In the event that the rental payment for October is not received within 30 days of the date of the mailing of this letter, Mr. Kelley will proceed to pursue his various legal remedies." Defendant construed plaintiff's letter of November 3, 1987, as a claim pursuant to the Contracts Disputes Act, codified at 41 U.S.C. §§ 601–13 (1978), and submitted it to the contracting officer (CO).

Meanwhile, plaintiff sent defendant a one-page document dated December 21, 1987, entitled "Demand For Payment Of Rent Or Possession." In it, plaintiff claims that defendant owed $5,740.00 for rent due from October 1, 1987 to December 1, 1987, and that this arrearage constituted a default under the terms of the lease modification entitling plaintiff to possession of the premises. Also, plaintiff asserts that this document constitutes notice to defendant as required under the Colorado Forcible Entry and Detainer Act (Col.Rev.Stat. § 13–40–104 (1987)).

By letter dated December 22, 1987, the CO denied plaintiff's claim, *inter alia* stating:

> Furthermore, you are advised that the Postal Service is asserting a claim against you in the amount of $75,398.51, representing $68,880.00 for the rent mistakenly paid you for the months October, 1985, through September 1987, $5,574.98 as interest through December, 1987, on the rental money mistakenly paid you, and $943.53 for real estate taxes which the Postal Service has paid and/or which are a lien against the property since September 30, 1985. This dollar claim is premised on: the Postal Service's interpretation of the lease as granting it an option to purchase the property, which option was exercised by letter dated July 2, 1984, and, by funds deposited in escrow with Lawyers Title Company on July 8, 1985. The Postal Service further claims it is entitled to a deed conveying marketable title to the premise from you.[8]

---

**5.** In Earley's original appraisal report of May 3, 1985, the property was valued at $343,000.00.

**6.** Although rent had been paid continuously by defendant since the lease expired on November 1, 1984 through the date of this settlement offer, plaintiff was asking for an additional $2,729.00 per month. This additional amount represents the difference between the $5,593.87 rent that plaintiff contends it would be owed after November 1, 1984, when the lease expired, and the $2,870.00 rent that defendant had been paying continuously. The exact formula for computing this additional rental is provided in paragraph 3(b) of the lease:

> b. *Rental during Renewal Terms.* The Postal Service shall pay to Owner as rent for the demised premises during each of the renewal terms, a monthly rental calculated in accordance with the following formula:

$$\text{Renewal Rental} = \frac{\text{New Appraised Value}}{\$175,980.00} \times \$2,870.00$$

The renewal rental shall be calculated separately for each renewal term. Notwithstanding the provisions of this paragraph 3(b), the rental during any renewal term shall in no event be less than the rental during the primary term, i.e., Two Thousand Eight Hundred Seventy Dollars ($2,870.00) per month.

The "New Appraised Value" numerator variable would be, under plaintiff's settlement offer, Earley's appraisal value of $343,322.00.

**7.** This November 3, 1987, letter was remailed on December 15, 1987, to defendant. The remailed version was sent Return Receipt Requested—Certified Mail. It appears from the record that the original mailed version was not sent with this instruction.

**8.** Defendant's claim for rent mistakenly paid is calculated from October 1985, rather than from the date the option purchase was allegedly exercised, July 1985, because, according to defendant, it requires that much time for closing.

Plaintiff, by letter, objected to the denial of his claim and to the $75.398.51 owed defendant. Plaintiff further denied that any such amount was "mistakenly paid" by the defendant for the months of October 1985 through September 1987. Plaintiff said that "he has refused to tender title to the subject property in light of the fact that the Earley appraisal was conducted improperly and contains numerous mistakes which have resulted in the improper valuation of the property." Plaintiff concluded:

> To the extent your letter of December 20, 1987, is not a denial or rejection under the Contract Disputes Act of all claims made by Mr. Kelley with respect to disputes involving the Ground Lease and Modifications thereto; a claim is hereby made upon you to declare the Earley appraisal on the subject property null and void because it contains numerous defects and was prepared in an unacceptable manner.

Plaintiff filed suit in this court on January 20, 1988, seeking an order of ejectment and payment of all rent due and owing under the lease and lease modification. Defendant filed a motion for summary judgment and plaintiff filed a cross-motion for summary judgment. Oral argument was heard on the cross-motions for summary judgment on June 14, 1988 and post-argument briefs were filed by August 8, 1989.

### Discussion

#### A. Jurisdiction

Plaintiff alleges jurisdiction under the Contract Disputes Act (CDA), codified at 41 U.S.C. §§ 601–13 (1978), and the Tucker Act, codified at 28 U.S.C. § 1491(a)(1) (1982), while defendant contends jurisdiction is proper only under the CDA.

The CDA applies to any express or implied contract entered into by defendant for procurement of property other than real property in being. 41 U.S.C. § 602(a)(1). Under the CDA, the Claims Court has jurisdiction to entertain claims arising from the lease of real property, such as plaintiff's claim for rental payments under the lease and lease modification.[9] *Jackson v. United States Postal Service,* 799 F.2d 1018, 1022 (5th Cir.1986), *reh'g denied,* 803 F.2d 717 (5th Cir.1986); *Forman v. United States,* 767 F.2d 875, 878 (Fed.Cir.1985).

In addition, this court has jurisdiction under the Tucker Act to hear plaintiff's claim. That Act provides the Claims Court with jurisdiction to hear claims against the government founded "either upon the Constitution or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort...." 28 U.S.C. § 1491(a)(1) (1982). *See Pauley Petroleum Inc. v. United States,* 219 Ct.Cl. 24, 37, 591 F.2d 1308 (1979). The court's Tucker Act jurisdiction would include the option to purchase real estate because it is part of the lease and it may create a separate contractual obligation with the United States. *Prudential Ins. Co. of America v. United States,* 801 F.2d 1295, 1296 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1086 (1987); *cf. Burgos v. Milton,* 709 F.2d 1, 3 (1st Cir.1983).

■ Plaintiff's complaint specifically requests from this court an order of ejectment. Plaintiff fails to cite any authority controlling on this court that has construed the Tucker Act as conferring jurisdiction on the Claims Court to issue ejectment orders. This court believes that it does not have such authority.[10] First, to the extent

---

**9.** Contract Disputes Act jurisdiction is proper over plaintiff's claim, currently valued over $50,000, despite being non-certified. *See Contract Cleaning Maintenance v. United States,* 811 F.2d 586, 591 (Fed.Cir.1987) (citing *Tecom, Inc. v. United States,* 732 F.2d 935, 937–38 (Fed.Cir. 1984)).

**10.** An order of ejectment requires determination of title of real property. *Canadian St. Regis*

*Band of Mohawk Indians v. New York,* 573 F.Supp. 1530, 1534 (N.D.N.Y.1983); "Ejectment ... is the classic form of action to try title. It takes place in the locality where the land is located. No judges are better qualified to try it than the local judges. It is a convenient and ready form of remedy for possession of land." *Bourgeois v. United States,* 212 Ct.Cl. 32, 44, 545 F.2d 727 (1976) (Kashiwa, J., dissenting) (citing *Malone v. Bowdoin,* 369 U.S. 643, 650–51, 82

that plaintiff's claim sounds in equity, (e.g. equitable ejectment), this court is without jurisdiction. *United States v. King*, 395 U.S. 1, 3, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). Furthermore, ejectment is not a claim for money, and therefore it is outside the scope of this court's jurisdiction. *Eastport v. United States*, 178 Ct.Cl. 599, 605–06, 372 F.2d 1002 (1967); *Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 743, 508 F.2d 817 (1974); *King*, 395 U.S. at 2–4, 89 S.Ct. at 1501–02; *Little River Lumber Co. v. United States*, 7 Cl.Ct. 492, 493 (1985) (citing *Express Foods, Inc. v. United States*, 229 Ct.Cl. 733, 736 (1981)) ("Failure to state a monetary claim against the United States provides a sound basis for dismissal of the complaint"). Finally, to the extent that plaintiff's ejectment claim sounds in tort, (e.g., trespass), this court is without jurisdiction. 28 U.S.C. § 1491(a)(1); *Prudential Ins. Co. v. United States*, 7 Cl.Ct. 710, 713 (1985), *aff'd*, 801 F.2d 1295 (Fed. Cir.1986); *Shanbaum v. United States*, 1 Cl.Ct. 177, 179 n. 3 (1982), *aff'd*, 723 F.2d 69 (1983). The court may not entertain claims outside the specific jurisdiction authority conferred by Congress. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957); *Tree Farm. Dev. Bank v. United States*, 218 Ct.Cl. 308, 316, 585 F.2d 493 (1978). For all these reasons, the Court is without jurisdiction to hear plaintiff's ejectment claim.

### B. *Summary Judgment*

Summary judgment is appropriate where the pleadings raise no genuine dispute as to any material fact and, as a matter of law the moving party is entitled to judgment. RUSCC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). The moving party bears the burden of establishing an absence of evidence to support the non-movant's case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The party opposing the motion for summary judgment has the

burden of showing sufficient evidence, not necessarily admissible, of a genuine issue of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefit of all presumptions and inferences runs. *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

To grant summary judgment in the present case, the court must find, as a matter of law, whether an enforceable agreement between the parties was formed, and, if not, whether defendant breached the lease by terminating rental payments.

The construction of an unambiguous writing is an appropriate matter for summary judgment. *Brame v. United States*, 10 Cl.Ct. 252, 254 (1986), *aff'd*, 818 F.2d 876 (Fed.Cir.1987), *cert. denied* 484 U.S. 822, 108 S.Ct. 83, 98 L.Ed.2d 45 (1987); *Ceccanti, Inc. v. United States*, 6 Cl.Ct. 526, 528 (1984) ("It is well settled that the interpretation of a contract is a question of law."); *D & S Universal Mining Co. v. United States*, 4 Cl.Ct. 94, 96 (1983); *South Louisiana Grain Services, Inc. v. United States*, 1 Cl.Ct. 281, 289 (1982). Neither party has suggested to the court that any interpretation other than one based on the plain meaning of the lease agreement and the lease modification indicates the intent of the parties. *ITT Arctic Services, Inc. v. United States*, 207 Ct.Cl. 743, 751–52, 524 F.2d 680 (1975). During oral argument, the parties stated that either the lease by itself or in conjunction with the lease modification would be dispositive of the issues of the case. (Tr. at 7, 16, 24, 26, 28, 55.)

### C. *Choice of Law*

██ Plaintiff argues that the lease and lease modification should be construed ac-

S.Ct. 980, 984–85, 8 L.Ed.2d 168 (1962), (Douglas, J., dissenting)). This court has no jurisdiction to quiet title of real property except in suits involving just compensation claims. *See Gila*

*Gin Co. and S & P Farms, Inc. v. United States*, 231 Ct.Cl. 1001, 1003 (1982); *see also Baskett v. United States*, 2 Cl.Ct. 356, 363 (1983).

cording to Colorado State law.[11] However, precedent dictates that contracts to which the government is a party "are normally governed by federal law, not by the law of the state where they are made or performed."[12] *Prudential,* 801 F.2d at 1298 (citing *United States v. County of Allegheny,* 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); *Forman v. United States,* 767 F.2d 875, 879 (Fed.Cir.1985); *Keydata Corp. v. United States,* 205 Ct.Cl. 467, 482, 504 F.2d 1115 (1974); *cf. George S. Groves v. United States,* 202 Ct.Cl. 660, 674 (1973)). Therefore, federal law, rather than Colorado State law, is applicable in the present case.

### D. *Breach of Contract*

Both parties argue both federal and state law in their respective positions on the lease and lease modification. However, "leases are not sufficiently different from other federal contracts to call for an independent set of analytical principles and rules." *Prudential,* 801 F.2d at 1298 (citing *cf. Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935)); *Forman,* 767 F.2d at 879; *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982)); *see Keydata Corp.,* 205 Ct.Cl. at 482. Accordingly, this court shall treat the lease and lease modification as a subject for general federal *contract* law.

Plaintiff asserts that defendant breached the lease modification by terminating payment of rent in October 1987. Plaintiff claims back rent with interest for all months when defendant has occupied the property without paying rent. In contrast, defendant avers that it has complied with the terms of the purchase option which created an enforceable contract for sale of the property. According to defendant's position, closing would have occurred approximately at the end of September 1985, and any sums paid as rent after that date would be erroneously paid, since the duty to pay rent under the lease modification would have ceased. Plaintiff responds that the option provision was never properly exercised because Earley's appraisal was invalid under the third appraisal provision.

The lease provides a specific procedure for determining the market value of the property for a renewal term or for purchase. In the event that the appraisal of each party differed, and the parties could not otherwise agree on price, a third appraiser should be mutually hired, who should confer with the two prior appraisers and then render his own appraisal. This third appraisal is then binding upon the parties for the purpose of determining new appraised value.

The parties do not dispute that Earley had copies of both prior appraisals and a copy of the lease prior to completing his appraisal. Nevertheless, he did not confer with the two prior appraisers as he was required to do under paragraph 5(b) of the lease. Plaintiff asserts that compliance was both material and necessary.[13] However, defendant argues that such noncompliance was "harmless error" or "immaterial." (Tr. at 9, 17.) Further, defendant argues that because Earley reviewed the prior two appraisals, Earley's conferring with them was unnecessary. *Id.*

At first glance, the third appraiser provision seems to have aspects suggesting both an arbitration and an appraisal. The third appraiser is arguably resolving a dispute between the parties as to the price of the property. His conclusion could not be altered or rejected by either party by agreement. Defendant asserts that the third appraisal provision is the functional equivalent of an agreement for binding arbitration[14] and should be reviewed by this court by analogizing to the Federal Arbitration Act, codified at 9 U.S.C. § 1 *et seq.* (1982). Defendant contends that the arbitration agreement here should similarly be "rigor-

---

**11.** The parties failed to include a choice of law provision in either the lease or the lease modification.

**12.** Contra *Reed v. United States Postal Serv.,* 660 F.Supp. 178, 180–82 (D.Mass.1987) (citing *Pow-*

*ers v. United States Postal Serv.,* 671 F.2d 1041, 1043 (7th Cir.1982)).

**13.** Plaintiff's Brief on the Issues, p. 5.

**14.** Defendant's Post Argument Brief, p. 3.

ously enforced" by the courts, consistent with the national policy expressed in that Act.[15] *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987) (citations omitted). Plaintiff argues that the parties contemplated another appraisal and not an arbitration. In support of this, plaintiff notes that the term "arbitration" does not appear in the lease. *Rodriguez de Quijas v. Shearson/American Express, Inc.,* —— U.S. ——, 109 S.Ct. 1917, 1918–19, 104 L.Ed.2d 526 (1989) (where an agreement specifically and without qualification called for binding arbitration).

In *Corbin On Contracts*, arbitration is compared with appraisal as follows:

> As in the case of other legal terms, the definitions of "appraisal" and "arbitration" are not absolute and invariable. There is not a hard and fast line between them. . . . The term "appraisal" is most commonly used to denote the process of valuation in money-the valuation of any kind of property or service. . . . Arbitration on the other hand, may involve many subjects other than valuation. Any dispute that can be the subject of litigation can also be submitted to arbitration.

6A. *Corbin on Contracts* § 1442 (1960).

The court finds that the parties contemplated an appraisal. The function of the third appraiser is no different than either of the other two appraisers, except, as the lease states, that the third appraiser shall (1) confer with the two prior appraisers and (2) review their respective appraisals before arriving at any appraisal valuing the demised premises. These two additional duties imposed on the third appraiser do not conflict with the narrow function of independently fixing value that is the hallmark of an appraiser. *Marceron v. Chevy Chase Services*, 258 F.2d 155, 158 (D.C.Cir. 1958); *City of Omaha v. Omaha Water*, 218 U.S. 180, 194, 30 S.Ct. 615, 616, 54 L.Ed. 991 (1910). Nor do these two duties suggest the procedure of an arbitration such as a hearing, witnesses, argument, etc. They indicate how the third appraiser will perform the valuation task; they do not transform the third appraiser into an arbitrator deciding between the two parties and their respective appraisers.[16] *See 6A. Corbin on Contracts* § 1442 (1960). Therefore, the procedure in the lease regarding the third appraisal contemplates an appraisal and not an arbitration, and the standard of review for arbitrators under the Federal Arbitration Act are not applicable here either directly or by analogy.

Assuming *arguendo*, if we should find that an arbitration was intended, our conclusion would not be changed. The court does not agree with defendant that analogizing to the demanding standards of review pursuant to the Federal Arbitration Act is appropriate or desirable. All cases cited by defendant fail to persuade the court that the enforcement of express terms of an option agreement between two parties should be subordinated to a national policy of rigorous enforcement of arbitration awards when there is no mandate from Congress to do so. First, as discussed *infra*, the rules of the arbitration were not followed because Earley failed to consult with the prior appraisers. Since

---

**15.** "In the context of arbitration agreements for labor disputes, the Supreme Court has recognized an extremely limited exception to agreements to be bound by arbitration. Only when the arbitration 'process has fundamentally malfunctioned by reason of bad-faith performance of the Union,' the court has recognized that the employee is not bound by the results of arbitration. (Citations omitted.) Drawing an analogy to this high standard, plaintiff clearly cannot meet his heavy burden to establish here that he is not bound by the independent, third party appraisal." Defendant's Post Argument Brief p. 3.

**16.** *Southeast Nursing Home v. St Paul Fire and Marine,* 750 F.2d 1531 (11th Cir.1985) presents the issue of whether an insurance contract clause calls for an appraisal rather than an arbitration. In construing it as an appraisal, the court pointed out that "only one issue [is] subject to resolution under the 'arbitration [labeled] clause' here, . . . the actual cash value of Southeast's loss." 750 F.2d at 1538. *Southeast* holds: "In sum, we are faced with a contractual provision that calls for appraisers to resolve the sort of dispute typically handled by appraisers in a manner in which appraisers customarily operate." *Id.* Similarly, in the case at bar, the third appraiser is only involved with the issue of valuation.

the parties treated the rules as a condition precedent to establish the price term, this failure resulted in a failure of a material term in the contract for sale of the property. Second, the conduct of the parties for 32 months under the lease modification indicates that both parties did not consider the arbitration to be binding since they never agreed upon a price. Therefore, this court finds that even if the third appraisal provision can be construed as one for arbitration, analogies to the Federal Arbitration Act and its policies are still inapplicable.

Accordingly, resolution of this case rests on interpretation of the contract. If all of the material terms of the purchase option have been satisfied by the parties, then an enforceable contract for sale of the property has been formed and defendant would be entitled to sums "erroneously" paid. In general:

> An "option to purchase," is a contract by which the owner of property agrees with another person that the latter shall have the right, power, or privilege to buy the former's property at a fixed price within a certain or specified time, or within a reasonable time in the future, and on agreed terms and conditions.

*91 C.J.S. Vendor and Purchaser* § 2 (1955). *See generally Aerojet General Corp. v. Kirk,* 318 F.Supp. 55 (N.D.Fla. 1970), *aff'd,* 453 F.2d 819 (5th Cir.1971), *cert. denied,* 409 U.S. 892, 93 S.Ct. 110, 34 L.Ed.2d 149 (1972).

> Since an option is a contract, it must contain all the incidents and essentials of a contract. To be legally enforceable, it must be clear, certain, specific, and unambiguous, its terms must be clear and definite and free from all ambiguity; in order that a valid option exist, *it is necessary that all material terms of the agreement be definitely settled and not left indefinite subject to future agreement.* [Emphasis added.]

*91 C.J.S. Vendor and Purchaser* § 6 (1955); *cf. 6A. Corbin on Contracts* § 29 (1960).

The purchase price is a material and essential contract term which must be agreed upon by the parties. *91 C.J.S. Vendor and Purchaser* § 6 (1955). Thus if no price is fixed, or if the price is indefinite or uncertain, the option is unenforceable. However, if the purchase option provides a method for subsequent determination of the price and the price is determined according to that method, the contract is enforceable as though the price had originally been fixed therein. *1. Corbin on Contracts* § 29 (1960); *51 C.J.S. Landlord and Tenant* § 81(4) (1967). Consequently, the method contained in the provisions for the third appraiser to determine price, once fulfilled, would result in an enforceable option.

The appraiser had four obligations under the contract, namely: (1) to appraise the property (without consulting the prior appraisals), then (2) confer with the original appraisers, (3) review their appraisals and finally (4) arrive at an independent appraisal valuing the property. Each of these four obligations is a condition precedent to establishing the price term of the option.[17] *3A. Corbin on Contracts* § 649 (1960). The option is not binding on either party until it is accepted according to its terms. Plaintiff had the right to insist that the option to purchase be exercised precisely in accordance with its terms. *Old Quarry Ass'n. v. Hickey,* 659 F.Supp. 1064, 1070 (D.Conn.1986); *El Paso Natural Gas Co. v. Western Bldg. Associates,* 675 F.2d 1135, 1040 (10th Cir.1982); *Owens Illinois, Inc. v. Lake Shore Land Co., Inc.,* 457 F.Supp. 896 (W.D.Pa.1978), *aff'd,* 610 F.2d 1185 (3rd Cir.1979); *91 C.J.S. Vendor and Purchaser* § 4 (1955).

■ The condition that the third appraiser confer with the two prior appraisers was not satisfied. Thus, the option to purchase was not binding and an enforceable agreement for the sale of the property was not formed. *National Rural Util. CO–OP. Finance Corp. v. United States,* 14 Cl.Ct. 130, 140 (1988), *aff'd,* 867 F.2d 1393 (Fed. Cir.1989); *Peoples Bank & Trust Co. v.*

---

**17.** That the third appraiser was hired and paid by both parties does not alter the fact that the parties agreed to contract only upon the successful fulfillment of all four conditions.

*United States*, 11 Cl.Ct. 554, 567 (1987); *Korea Development Corp. v. United States*, 9 Cl.Ct. 167, 175–76 (1985).

This result is in harmony with the actions of the parties. No events in the record from the release of the Earley appraisal till the defendant terminated rental payments in October 1987 indicate that the parties were close to agreement over the price term.

Furthermore, plaintiff and defendant entered into the lease modification on January 30, 1985, knowing that a sale had not occurred and might not ever occur. The lease modification, drafted by defendant, expressly recognized that the purchase might not occur at all. It states: "in the event the sale is not consummated as provided for in the lease the Postal Service may exercise the Option to Renew...." Defendant made 32 monthly payments under the lease modification and it was in effect at the time defendant terminated rental payments. Defendant's assertion that a contract for sale was formed is counter to the parties' subsequent performance under the lease modification. The parties contemplated a month-to-month tenancy while they negotiated a price for the property. The letters of March 19, 1986, April 14, 1986, and June 10, 1987, indicate negotiations concerning the Earley appraisal and a satisfactory purchase price. There is no evidence in the record that during this time the parties ever agreed upon a purchase price. Continuing to pay monthly rental payments for 32 months under the lease modification while participating in these negotiations, the defendant may not at a later date abandon the contract interpretation that a contract for sale had not been formed, when it acted on that interpretation to plaintiff's knowledge during these 32 months. *Simmonds Precision Products, Inc. v. United States*, 212 Ct.Cl. 305, 318, 546 F.2d 886 (1976).

### E. Rent

■ The lease modification resulted in the conversion of the term period of 5 years into a month-to-month tenancy. This tenancy could have been terminated with-out breach by sale of the property, renewal of the lease, or upon 30–day written notice sent by defendant to plaintiff.

Defendant terminated rental payments without notice in October 1987. Plaintiff's letter of November 3, 1987, informed defendant that rent must be paid within 30 days in order to avoid default. Defendant's failure to pay in accordance with the letter constituted a material breach of the lease and lease modification. Under contract law, this gave plaintiff the choice of either canceling or continuing these agreements. *Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 234–36, 543 F.2d 1306 (1976). Plaintiff elected to cancel the lease and lease modification by sending defendant the "Demand For Payment Of Rent Or Possession" document, which is dated December 21, 1987. This cancellation is further evidenced by plaintiff's indication on January 5, 1988, that he would immediately sue defendant for damages and ejectment.

Defendant's status after default under the month-to-month tenancy was effectively that of a tenant-at-sufferance. *Brach v. Amoco Oil Co.*, 570 F.Supp. 1437, 1441 (N.D.Ill.1983); *51C C.J.S. Landlord and Tenant* § 148 (1968); *49 Am.Jur.2d Landlord and Tenant* § 1103 (1968). Tenants-at-sufferance are liable for rent due while in possession of the property. *Brach*, 570 F.Supp. at 1440–1441; *cf. Murphy v. Texaco, Inc.*, 567 F.Supp. 910, 912–13 (N.D.Ill. 1983); *cf. Vereka Investments, N.V. v. American Inv. Properties, Inc.*, 724 F.2d 907, 911 (11th Cir.1984), *cert. denied*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984); *cf. Stella v. DePaul Community Health Center, Inc.*, 642 F.2d 258, 260 (8th Cir.1981). Plaintiff is thus entitled to rental payments pursuant to the month-to-month tenancy, beginning October 1987. Defendant's claim that rental payments made between October 1985 and September 1987, were "mistakenly paid" is, therefore, denied. In addition, pursuant to paragraph 21 of the lease, it was defendant's responsibility to pay real estate taxes and rent. Since the court finds defendant liable for rent, defendant's claim for real estate taxes is consequently denied.

**166**

Plaintiff requests an increased rental value. He suggests that after the expiration of the lease in November 1984, the parties were operating under an increased renewal rate of rent under the lease. However, computation of the renewal rate requires, and plaintiff asserts for this purpose, adherence to the Earley appraisal, which this court has determined to be defective. Plaintiff fails to offer any additional basis for a claim of increased rental rate. Therefore, this claim is denied.

### F. *Interest*

Finally, plaintiff asserts a claim for interest on an award of back rent. The CDA provides:

> Interest on amounts found due contracts on claims shall be paid to the contractor from the date the contracting officer receives the claim pursuant to Section 605(a) of this Title from the contractor until payment thereof. *The interest provided for in this section shall be paid at the rate established by the Secretary of the Treasury pursuant to Public Law 92–41 (85 Stat. 97) for the Renegotiation Board.* [Emphasis added.]

41 U.S.C. § 611. *See Henry v. United States,* 8 Cl.Ct. 389, 394 (1985). Finding that plaintiff is due money from the contract, he is also entitled to an award of a simple interest from November 3, 1987, the date the contracting officer received plaintiff's claim. *J.M.T. Mach. Co., Inc. v. United States,* 826 F.2d 1042, 1045–46 (Fed.Cir. 1987); *Essex Electro Engineers, Inc. v. United States,* 702 F.2d 998, 1003–04 (Fed. Cir.1983).

### *Conclusion*

For the reasons stated above and pursuant to RUSCC 42(c), plaintiff's cross-motion for summary judgment is hereby granted and defendant's motion for summary judgment is denied. Defendant is not entitled to recover on its counterclaim. The parties are directed to file, within 20 days, a joint stipulation as to the amount due plaintiff for rent to be calculated at $2,870.00 per month, beginning October 1987, plus simple interest, pursuant to 41 U.S.C. § 611.

Accordingly, the Clerk is directed to enter judgment at that time without further order of this court. No costs.